66 N.J. Super. 255 (1961)
168 A.2d 844
PHILIP H. ASPLUND AND MARIAN I. ASPLUND, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
MARJOHN CORPORATION, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1961.
Decided March 20, 1961.
*257 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Charles R. Hardin, Jr. argued the cause for appellants (Messrs. Pitney, Hardin & Ward, attorneys).
Mr. Sanford Halberstadter argued the cause for respondent (Messrs. Feinberg & Feinberg, attorneys; Mr. Halberstadter, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiffs instituted this action for return of a $5,000 land sale contract deposit and incidental damages. The Chancery Division judge, upon examining the contract and hearing the parties' proofs, determined that plaintiffs had wrongfully refused to consummate the transaction set forth in the instrument and were therefore not entitled to a return of their entire deposit; however, because of a specific clause in the document limiting the purchasers' forfeiture of deposit to $3,400, judgment was entered in plaintiffs' favor in the amount of $1,600. Plaintiffs *258 appeal from so much of the judgment as denied them recovery in excess of $1,600.
By agreement dated March 20, 1959 the Asplunds contracted to purchase from the Marjohn Corporation, a developer, a plot of land and one-family dwelling to be erected thereon, located in Mountain Lakes. Closing was set for September 1, 1959. The $1,000 original down payment by the purchasers was supplemented at the contract signing by an additional deposit of $4,000. The balance of the $34,292 purchase price was to be paid upon delivery of the deed. The parties jointly agreed to attempt to obtain a mortgage for the Asplunds, and established August 1, 1959 as the deadline for the securing of such financing. Their efforts and obligations in this regard were embodied in paragraph 4 of the contract, providing in pertinent part that:
"4. Seller agrees to use his best efforts to procure for Purchaser, and Purchaser agrees to apply to lending institutions designated by Seller for, a conventional purchase money mortgage loan on said premises in the amount of $27,000.00, payable with interest at the rate of 5 1/2% per annum over a term of thirty years or longer. Purchaser agrees to submit such financial information and to execute all documents which may be required to obtain such a purchase money mortgage loan and to accept said loan when the commitment therefore is issued by the lending institution. If no lending institution shall have issued a firm commitment for such a mortgage loan by August 1, 1959, then at the option of either Seller or Purchaser this Agreement shall become null and void."
The heart of the present appeal is the question of whether the mortgage commitment contingency, as set forth above, was satisfied on or prior to August 1, 1959. If it was, then plaintiffs were not justified in treating the contract as null and void and refusing to proceed with the transfer of title.
Plaintiffs' contentions focus on two asserted deficiencies in defendant's effort to secure a mortgage commitment complying with the terms of paragraph 4, namely: (1) failure to obtain a "firm commitment"; and (2) failure to obtain a commitment from a "lending institution," within the contractual meaning of that term.
*259 The first of these assertions is premised on an exchange of correspondence in late July and early August of 1959. It is clear that up to the last week in July no commitment had been obtained which conformed to the contract or was nonetheless satisfactory to plaintiffs. One proposal, in June, was rejected because of an attached rider which would have increased the cost to the Asplunds by more than $3,000; another, discussed in mid-July, would have required Mr. Asplund to purchase life insurance at an annual expense of $700 and was therefore likewise unacceptable; a third offer, considered and refused during the latter part of July, would have entailed a $25,000 commitment supplemented by a direct one-year loan of $2,000 to plaintiffs by defendant.
On July 27, 1959 Marjohn received a letter "commitment," dated July 24, 1959, in the desired amount, term, and interest rate from one "North American Investment Associates, Inc.," signed by "Michael Pal, Vice-Pres." Written acceptance of the offer was immediately sent to North American by Marjohn, and on the same day a registered letter was dispatched by Gerald B. Graham, Marjohn's president, to Mr. Asplund, advising him that the specified commitment "has been obtained by this office," but not indicating from whom. During the next several days Graham had a number of telephone conversations with Asplund. The latter testified that he was told by Graham that Marjohn did not have a firm commitment in accordance with the contract. Graham's version of the conversation was that Asplund seemed uncertain as to whether a conforming commitment had in fact been obtained or whether Graham's registered letter was merely a restatement of one of the prior offers, already rejected. To resolve the uncertainty, Graham dispatched another letter, dated July 31, 1959, advising Asplund that "another" qualifying commitment had been obtained. In line with his version of his telephone conversations with Asplund, Graham explained on the witness stand that both of his letters to Asplund had referred to one and the same commitment  that from North American.
*260 Asplund, meanwhile, also wrote to Graham on July 31, 1959, requesting that the latter notify plaintiffs' attorney of "the complete terms of the commitment, (a copy of the written commitment would be appreciated) * * *." This letter went unanswered, although, according to Graham, he repeatedly invited plaintiffs by telephone to appear at his offices to inspect the commitment papers. Plaintiffs' attorney wrote to Marjohn on August 7, as follows:
 "August 7, 1959
 Marjohn Corporation
 Woodland of Mountain Lakes
 Mountain Lakes, New Jersey
 ATTENTION: Mr. Gerald B. Graham, President
 RE: Asplund from Marjohn Corporation
 8 Ronarm Drive, Mountain Lakes, N.J.
Dear Sirs:
Despite your letters of July 27 and July 31 to Mr. Philip H. Asplund, we gather from our telephone conversation with Mr. Gerald B. Graham on August 5 that you do not have a commitment for the mortgage specified in paragraph 4 of the contract for the above conveyance. Accordingly, and pursuant to paragraphs 4 and 14 of the contract, we advise you that Philip H. Asplund and Marian I. Asplund, his wife, exercise their option to declare the purchase agreement null and void and request that you return to them forthwith the deposit of $5,000.00.
The contract clearly specifies a firm commitment for a conventional purchase money mortgage loan to the purchasers on the premises in the amount of $27,000.00, payable with interest at 5 1/2% over 30 years or longer, with purchasers' expenses in connection with the loan not exceeding the sum of $460.00. If our understanding of the telephone conversation is incorrect, and you do have a firm commitment for such a loan, please send us the written commitment so that it may be accepted by Mr. and Mrs. Asplund. Otherwise, we shall expect to receive your check to their order for $5,000.00 no later than next Wednesday, August 12, 1959.
 Very truly yours,
 PITNEY, HARDIN & WARD
 By _________________________
 Charles R. Hardin, Jr."
Graham testified that he denied this request also because "in view of three previous deals being reneged on and in *261 view of the implications of the telephone conversation, this was now going to be a legal situation," and "I didn't want to offer any evidence * * * [to plaintiffs] * * * without any legal advice." He explained his position as follows: "If they were willing to come down to the office and look at the commitment and fill out the applications, they were there, ready and waiting for them." At that point, he wanted legal counsel "before going any further with the Asplunds."
On August 20, 1959 plaintiffs, having previously disposed of their former house, by contract which required their vacation therefrom by September 1, and having begun on August 1 to look for another home, contracted to purchase other property; they took possession of same on August 24, 1959.
Insofar as plaintiffs attack the "firmness" of the commitment, as distinguished from the nature of the issuing organization, two facets of their argument must be considered: (a) whether a commitment was actually issued at all; (b) whether the commitment had substance, i.e., likelihood of being honored.
On the first question, there was sufficient evidence before the trial court to justify the factual determination that North American had in fact communicated a commitment in the contractual terms, at least on paper, to the defendant. The letter of North American to Marjohn, dated July 24, 1959, sufficed for that purpose.
A more debatable issue is presented as to whether the commitment was "firm." The proofs are that North American intended to "farm out" this mortgage but had not made arrangements to do so; moreover, it was to receive a $1,000 fee from the defendant for doing so. It may well be argued that it was in fact only undertaking to place a mortgage as a broker, rather than grant one itself. Whether this was a "firm commitment" in the sense of the agreement is questionable. We need not decide the point, however, in view of our later conclusion that North American was not a *262 "lending institution" within the fair meaning of the agreement between the parties.
Plaintiffs urge, moreover, that defendant is equitably estopped to assert that a firm commitment was obtained, in view of Graham's telephone statements to Asplund in the closing days of July and his silence during the first week of August following receipt of plaintiffs' letters, on the basis of all of which plaintiffs purchased another home. This argument ignores the testimony of Graham that subsequent to receipt of the commitment from North American, he had never told plaintiffs that he had not obtained a proper commitment, but rather had repeatedly insisted that the commitment was ready and waiting in his office for plaintiffs to examine and sign.
Our power to make original findings of fact is circumscribed by our deference to the opportunity of the trial judge to pass upon the credibility of the witness, R.R. 1:5-4(b); Aiello v. Knoll Golf Club, 64 N.J. Super. 157, 164-165 (App. Div. 1960). Plaintiffs have, in effect, asked us to underplay those aspects of the evidence most susceptible to appellate review, i.e., the written correspondence conceded by all parties to have been sent and received as stated, and to upset the primary findings of the trial judge in that domain in which his opinion is entitled to the greatest of weight. We are not disposed to adopt such an approach. The trial judge plainly credited defendant's version of the negotiations and he stressed the evidence indicating that plaintiffs were eager to buy a different home rather than go through with the contract with defendant.
Considering the documents in evidence, in combination with the supportive testimony and the trial judge's evaluation thereof, we conclude that plaintiffs did not, in purchasing another property, rely upon defendant's alleged statement that it did not have a mortgage commitment.
The issue of North American's status as a "lending institution" raises a more troublesome question. Plaintiffs maintain that although "lending institution" is not a term *263 of art, that term, in the context of this instrument, must have reference to either an established society or a corporation engaged in lending money, and that "North American Investment Associates, Inc." was not such a body as of the date of the alleged commitment. The trial judge, apparently accepting plaintiffs' premise, nevertheless found that North American was at the time of the asserted commitment a de facto corporation. Defendant accepts neither the premise nor the conclusion, positioning its lines of defense in the following order: (1) "lending institution" must be given an expansive reading to accord with the parties' primary purpose of securing a mortgage commitment; (2) the status of the proposed mortgagee may not be attacked collaterally; and (3) even if the status of North American can be inquired into, it was a de facto corporation and therefore a "lending institution."
An "institution" is broadly defined as an established or organized society or corporation, either public or private in character. Cf. In re Peabody's Estate, 21 Cal. App.2d 690, 70 P.2d 249 (D. Ct. App. 1937). Although the precise meaning of the term may vary according to the operative context, see, e.g., Rine v. Wagner, 135 Iowa 626, 113 N.W. 471, 473 (Sup. Ct. 1907), it seems universally accepted that "institution" imports a substantial degree of internal organization and legally sanctioned stability. In the realm of finance, this interpretation finds persuasive support in our Banking Act, N.J.S.A. 17:9A-1 et seq., wherein "banking institution" is defined as "a bank, savings bank, and a national banking association," all three comprising bodies incorporated under state or federal law. The plain statutory distinction between corporations and individuals, see Feller v. Architects Display Building, Inc., 54 N.J. Super. 205, 214 (App. Div. 1959), accords with common understanding and is, in our opinion, of substantial aid in the resolution of the issue before us. We conceive of a "lending institution" as an established public or private financing body, incorporated or otherwise recognized under *264 appropriate law. In the context of this contract our interpretation implements the desire of many borrowers to deal with an established firm in order to be assured that the loan transaction and any future difficulties related to its performance will be openly and fairly resolved; and, moreover, to be assured at the time the commitment issues that it will be honored at the time of the closing.
We therefore must consider whether the proposed mortgagee offered by defendant qualified as a "lending institution," in the sense indicated, at the time under consideration. It is conceded by defendant that North American was never incorporated eo nomine under the laws of this State and therefore was not a de jure corporation on August 1, 1959. We are thus faced with the issue of whether it was at least de facto recognized by our laws. We reject, initially, defendant's attempt to block consideration of this question by urging upon us Vanneman v. Young, 52 N.J.L. 403 (E. & A. 1890); the holding therein was only to the effect that the legality of incorporation of an obviously de facto body cannot be attacked collaterally. Inquiry may always be made as to whether a purported corporation has attained even de facto status. See, e.g., Federal Advertising Corp. v. Hundertmark, 109 N.J.L. 12 (Sup. Ct. 1932); Culkin v. Hillside Restaurant, Inc., 126 N.J. Eq. 97 (Ch. 1939).
To establish the existence of a de facto corporation, it must be demonstrated that: (1) there is a law under which a corporation with the power assumed might be incorporated; (2) there has been a bona fide attempt to organize a corporation in the manner prescribed by the statute; and (3) there has been an actual exercise of corporate powers. Stout v. Zulick, 48 N.J.L. 599, 601 (E. & A. 1886); Frawley v. Tenafly Transportation Co., 95 N.J.L. 405, 411 (E. & A. 1921); Burstein v. Palermo, 104 N.J.L. 414, 417 (E. & A. 1928); Gallant v. Fashion Piece Dye Works, 116 N.J. Eq. 483, 484 (Ch. 1934); 8 Fletcher, Cyclopedia Corporations (perm. ed. 1931), § 3777, p. 71. Plaintiffs concede that there is a law under which North *265 American might have been incorporated as a "lending institution," but contend that the other two essential elements are absent.
Where corporate existence is in issue, the burden of proof is ordinarily on the party asserting such existence, whether affirmatively or defensively. See 8 Fletcher, supra, § 4132, pp. 590-93; 18 C.J.S. Corporations § 75, p. 459. Defendant attempted to meet that burden through the testimony of Michael Pal, vice-president of North American. Pal testified that he and several associates first went into business as North American Investment Associates, Inc., "three or four months before" July 1959. Late in 1959 the group discovered that the necessary incorporation papers had not been filed; a certificate of incorporation, under the slightly altered name of North American Associates, Inc., was subsequently filed on November 24, 1959. It was stated in colloquy, by defendant's counsel, that incorporation papers for North American Investment Associates, Inc., had been prepared, signed and left with an attorney prior to the date of the Asplund commitment, but that the attorney had neglected to file the documents; however, no testimony was introduced in support of this gratuitous statement.
Pal testified that he was not an incorporator of North American Investment Associates, Inc., and that he did not know who the incorporators were. He had no knowledge of the exact date when he was elected vice-president. He said that there may have been a formal meeting of the corporation but he "wasn't present," and that he never attended any meetings of the corporation; he did not know who the stockholders were, but imagined "I had one share," and added that "I was just told by Mr. Garfinkle that I was elected Vice-President of the corporation."
Pal further stated that he had never seen a certificate of incorporation or any minutes of any meetings. No attempt was made to introduce any allegedly completed but unfiled certificate into evidence.
*266 While mere failure to file its certificate and accompanying papers may not, under certain circumstances, preclude a corporation from existing de facto, Frawley v. Tenafly Transportation Co., supra; see Annotations, 22 A.L.R. 376 (1923), 37 A.L.R. 1319 (1925), the testimony of Pal lends but negative support to any showing of a bona fide effort to incorporate North American prior to August 1, 1959. The failure to file at all until November  and then in a different name  is a circumstance weighing heavily in our conclusion that defendant has not satisfied its burden in this regard.
Of even stronger influence, moreover, is the complete absence of proof of exercise of corporate powers prior to the time of the commitment here considered. Pal testified that the firm shared a Paterson office with an insurance business, operated by the same group, and with at least five other corporations of similar origin. Early in 1959 the group had decided to branch out from their primary business of insurance into the investment field. In the late spring and early summer of 1959 they were engaged primarily in "canvassing different outfits for business, the possibility of setting this up on a full-scale plus contacting banks." Although Pal insisted that they were engaged in business at this time, he admitted that the "business" consisted solely of "endeavoring to set a complete operation up." He further conceded that North American closed its first loan of any kind in August 1959, a combination automobile loan and chattel mortgage on furniture. A search of the Essex County records by plaintiffs' counsel resulted in a trial stipulation that North American was named as mortgagee on three separate instruments, the earliest dated September 17, 1959, and the others October 28 and 29; all were with Mr. Graham or one of his corporations.
Thus, there is no evidence that North American, prior to its contact of defendant, had consummated any loans, was negotiating any loans, or had in any way begun to exercise corporate powers. The totality of the proofs requires *267 a conclusion that North American had not, by August 1, 1959, either engaged in that degree of corporate user to warrant recognition as a de facto organization or become sufficiently established and responsible in the mortgage lending business to be deemed a "lending institution" within the common understanding of that term.
Plaintiffs bargained for, and obtained in their contract, the assurance of the security of an established mortgage institution as a condition precedent to their obligation to consummate the purchase. The condition may be considered a substantial one, in light of the reliance of an individual purchaser on the stability and responsibleness of a proposed mortgagee, upon the strength of whose commitment the buyer generally proceeds to dispose of his existent homestead and to plan a well-timed entry into new quarters, as well as to invest the time, effort and money entailed in preparing for closing. The condition failing to occur, by virtue of the non-production of a "lending institution," plaintiffs' exercise of their contractual privilege of withdrawal was entirely proper.
Defendant's contention that plaintiffs are not entitled to contest the status of North American is without merit. Contrary to Marjohn's assertion, the pretrial order was broad enough to encompass this issue, in its general summary of plaintiffs' allegation "that the defendant failed to obtain for them a mortgage commitment in accordance with the terms of the contract * * *." Concerning plaintiffs' lack of knowledge of the deficient status of North American at the time of their repudiation, we do not agree with defendant that they are therefore precluded from raising the question. We are aware of no rule of law barring a party from asserting the non-performance of an express contractual stipulation as a justification for invoking his consequent contractual rights merely because the adversary's default had not come to his attention at the very moment he acted. See Bertrand v. Jones, 58 N.J. Super. 273, 284-285 *268 (App. Div. 1959), certification denied 31 N.J. 553 (1960). Considerations of waiver or estoppel are not here involved.
The judgment of the trial court is accordingly modified to include an order entitling plaintiffs to a return of the entire remaining balance of their deposit, namely, $3,400.
So ordered.