Thelma GRAVNING, Applicant,

v.

Steven J. ZELLMER, duly appointed, qualified and acting Secretary of Revenue of the State of South Dakota, and James Myers, duly appointed, qualified and acting Railroad Director of the State of South Dakota, Respondents.

Thelma GRAVNING, Applicant,

v.

Alice KUNDERT, duly elected, qualified and acting Secretary of State of the State of South Dakota, Respondent.

Nos. 13079, 13080.

Supreme Court of South Dakota.

Argued April 3, 1980.

Decided April 17, 1980.

Rehearing Denied May 28, 1980.

L. Anthony Weisensee, Sioux Falls, for applicant.

Mark V. Meierhenry, Atty. Gen., Pierre, for respondents; David O. Carter, John C. Wiles, and John Dewell, Asst. Attys. Gen., Pierre, on brief.

Horace R. Jackson of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for amicus curiae Independent Truckers Association.

Robert B. Frieberg of Frieberg, Frieberg & Peterson, Beresford, for amicus curiae Sioux Valley Regional Railroad Authority.

WOLLMAN, Chief Justice.

These are original proceedings in which applicant seeks writs of prohibition and mandamus. We deny the writs sought and quash the alternative writs previously issued.

In # 13079, applicant seeks to prohibit the Secretary of Revenue and the Director of Railroads from taking any action pursuant to Senate Bill 225, which was enacted by the Legislature on March 12, 1980.

In # 13080, applicant seeks to compel the Secretary of State to accept and file pursuant to SDCL 2–1–6.1 a copy of a petition that would propose to refer Senate Bill 225 to a vote of the electors at the 1980 general election.[1] The Secretary of State refused to accept the petition for filing on the ground that the act sought to be referred contains an emergency clause and is therefore not referable in view of South Dakota Constitution article III, § 1, which provides:

> The legislative power of the state shall be vested in a Legislature which shall consist of a senate and house of representatives, except that the people expressly reserve to themselves the right . . . to require that any laws which the Legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions . . . .

Senate Bill 225 is entitled "An Act to provide for additional duties to the division of railroads, to create a South Dakota state railroad board, to provide for its duties and members, to increase certain taxes, to provide for certain rail expenditures, to make

---

1. SDCL 2–1–6.1 provides:

    Any person or political committee who has commenced the circulation of an initiative petition, referred petition or initiated constitutional amendment petition shall file a copy of the petition with the secretary of state prior to the circulation thereof.

an appropriation therefore [sic] and to declare an emergency."

Sections 1 through 13 of the act affect SDCL Chapter 1–44, which sets forth the scope and functions of the Department of Transportation, by amending existing portions of that chapter and by adding new sections thereto.

As originally enacted, SDCL 1–44–17 provided: [2]

A division of railroads is hereby created within the department of transportation. The head of the division of railroads shall be the director of railroads, who shall be appointed by the secretary of transportation with approval of the Governor.

Section 1 of the act amends this provision by providing that the Director of Railroads shall be appointed by the Governor.

SDCL 1–44–18 originally provided:

It shall be the duty of the division, within the state of South Dakota, to conduct research on basic railroad problems, to plan and assist in the development of rail transportation, to develop and maintain a federal-state relationship of programs relating to railroads, and to assist the department of transportation or any public or private agency or corporation in co-ordinating railroad services with those of other transportation modes.

As amended by § 2 of the act, SDCL 1–44–18 now reads:

It shall be the duty of the division, within the state of South Dakota, to conduct research on basic railroad problems, to plan and assist in the development of rail transportation, to develop and maintain a federal-state relationship of programs relating to railroads, to assist the department of transportation or any public or private agency or corporation in co-ordinating railroad services with those of other transportation modes, to recommend, prepare, and review plans and specifications for any project undertaken by the South Dakota railroad authority, and to arrange for and coordinate rail service over any and all properties and facilities acquired, leased or controlled by the state of South Dakota railroad authority.

Section 3 of the act adds the following section to Chapter 1–44:

Notwithstanding any other provision of law, the division of railroads, with the approval of the South Dakota state railroad board and the written consent of the Governor, may enter into agreements, contracts, leases (as lessor or lessee) or other arrangements with any corporation, partnership, individual, agency or authority, on such terms and conditions as the division shall determine, including, but not limited to, providing for the acquisition, operation, maintenance and improvement of public rail lines, and the acquisition and disposition of any and all rights-of-way, land, facilities, fixtures and appurtenant structures, services and equipment, determined by the division to be necessary or appropriate.

Section 3A of the act provides that the Railroad Authority and the Division of Railroads shall not purchase or contract to purchase any railroad rolling stock nor operate any railroad without prior specific approval of the Legislature.

Sections 4 through 13 of the act relate to the authority of the Division of Railroads, create the State Railroad Board, appropriate certain funds for administration and research by the Division of Railroads, and create a bipartisan legislative task force to monitor the impact of the rail car program authorized by Section 11 of the act.

Sections 14 through 21 of the act provide for an increase in certain sales, excise, and use taxes. Section 22 provides that the tax increase established in the foregoing sections is repealed on July 1, 1981, or when the revenue raised thereby is sufficient to repay all obligations incurred by the Railroad Authority, whichever occurs first. Section 23 provides that ninety-eight percent of the revenue derived from the increase in taxes pursuant to the foregoing sections shall be credited to the railroad

**2.** Sections 1–44–17 through 1–44–19 were added to Chapter 1–44 by 1975 S.D.Sess.L. ch. 26.

authority fund, with the remaining two percent to be credited to the state general fund.

Finally, Section 24 provides that "Whereas, this Act is necessary for the support of the state government and its existing public institutions, an emergency is hereby declared to exist, and this Act shall be in full force and effect from and after its passage and approval."

Senate Bill 252, also enacted on March 12, 1980, and not under attack in these proceedings, is entitled "An Act to create the South Dakota railroad authority, to define its powers and duties and to declare an emergency."

Section 1 of this act sets forth in some detail the legislative declaration concerning the serious emergency within the state resulting from the imminent abandonment by railroads of substantial services and the necessity of public participation in the operation and ownership of railroad properties and facilities and the conduct of railroad services.

Section 3 of the act creates the South Dakota Railroad Authority. Section 10 authorizes the Railroad Authority to, among other things, acquire, maintain, and equip railroads and railroad facilities. Section 13 authorizes the Railroad Authority to "acquire . . . construct, maintain and equip railroad facilities as the Legislature by law declares to be in the public interest." Sections 11 and 14 provide that the Division of Railroads shall establish the priority listing of projects to be entered into by the Railroad Authority and shall have supervision over any projects undertaken by the Railroad Authority. Other sections of the act specify the terms under which the Railroad Authority may enter into leases and the terms and conditions under which it may raise funds by issuing bonds. Section 45 of the act contains an emergency clause similar to that found in Senate Bill 225.

Senate Bill 249, also enacted on March 12, 1980, and also not under attack in these proceedings, authorizes the South Dakota Railroad Authority to acquire certain rail lines within the state. Section 1 of this act provides that:

It being hereby declared to be in the public interest, the South Dakota railroad authority is authorized to acquire, construct, improve and equip facilities for the division of railroads, such facilities consisting of the following segments of existing railroad facilities, including land and all fixtures and appurtenances adjacent thereto and including necessary expenses and reasonable reserves all for the estimated cost, not to exceed twenty-five million dollars ($25,000,000) . . . ..

There follows a description of certain existing railroad facilities of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, the Chicago and Northwestern Transportation Company, Burlington Northern, Inc., and the Illinois Central Gulf Railroad Company.

Section 5 of the act authorizes the Division of Railroads to enter into lease agreements with the Railroad Authority and to make rental payments from appropriations to be made by the Legislature. Section 6 of the act provides that the "acquisition, construction, improvement and equipping of such facilities shall be under the general charge and supervision of the division of railroads . . . ." Section 7 of the act contains an emergency clause similar to those found in Senate Bills 225 and 252.

We have discussed the provisions of the three bills in some detail because the acts obviously were intended to carry out the intention of the Legislature to acquire certain rail lines in order to preserve the existence of adequate rail service within the state.

With this trilogy of legislative enactments as a backdrop, we proceed to an analysis of applicant's attack upon the validity of the emergency clause attached to Senate Bill 225.

Although the state argues in the alternative that notwithstanding the wording of the emergency clause contained in Senate Bill 225 this Court could find, under the authority of *Culhane v. Equitable Life Assurance Society*, 65 S.D. 337, 274 N.W. 315

(1937), that the act is necessary for the immediate preservation of the public peace, health or safety, we conclude that the conditions that gave rise to the legislation in issue in the *Culhane* case are not present in the case before us. Accordingly, we will limit our discussion to a consideration whether Senate Bill 225 is necessary for the support of the state and its existing public institutions.

We address first the question whether there is an existing public institution within the meaning of art. III, § 1 that Senate Bill 225 may be said to support.

South Dakota Constitution art. XVII, § 15 states in part that "Railways heretofore constructed or that may hereafter be constructed, in this state are hereby declared public highways, and all railroad and transportation companies are declared to be common carriers and subject to legislative control . . . ."

Chapter 106 of the Laws of 1931 (codified as SDCL 49–17; repealed by 1976 Sess. L. ch. 294, § 39) provided for public aid to railroad construction, including the issuance by county commissioners of bonds for the purpose of aiding in the construction of proposed railroad lines.

As has already been indicated above, the Legislature in 1975 created the Division of Railroads within the Department of Transportation.

By Chapter 342, Laws of 1978, the Legislature established a program whereby the Department of Transportation was directed to take action to improve branch line railroad service within the state. See SDCL 49–17–22 through 49–17–29. Section 1 of this act (SDCL 49–17–22) provides:

> The department of transportation shall identify those segments of branch line railroad trackage which, if improved, may provide increased transportation services for the citizens of this state.

Chapter 343, § 1 of the laws of 1978 (SDCL 49–17–19) authorized the Transportation Commission to, among other things, "contract for the acquisition, construction, improvement, maintenance or operation of railroads or railroad facilities."

By Chapter 344, Laws of 1978, the Legislature adopted the Regional Railroad Authority Act. SDCL 49–17A. Under this chapter, subdivisions (defined as "any county, municipality, or other body politic of this state") may form a regional railroad authority by agreement, which agreement shall state that the railroad authority "is created and incorporated . . . as a political subdivision of this state." SDCL 49–17A–1(4), 49–17A–2, 49–17A–3(1). Pursuant to SDCL 49–17A–16, regional railroad authorities are empowered to

> plan, establish, acquire, develop, construct, purchase, enlarge, improve, maintain, equip, operate, regulate, and protect its railroads, and railroad facilities used or useful in the operation of the railroad. For such purposes an authority may acquire by purchase, gift, devise, lease, condemnation real or personal property or any interest therein.

In interpreting the provisions of art. III, this Court has frequently looked to the decisions of the Supreme Court of Washington, for the corresponding provisions of that state's constitution are similar to art. III of our Constitution. See, e. g., *State ex rel. Kornmann v. Larson*, 81 S.D. 540, 138 N.W.2d 1 (1965); *State ex rel. Wegner v. Pyle*, 55 S.D. 269, 226 N.W. 280 (1929); *Hodges v. Snyder*, 43 S.D. 166, 178 N.W. 575 (1920). In responding to the argument that an existing public institution is some activity of the state that has taken form and is lodged in buildings or structures, the Supreme Court of Washington stated:

> The words "public institutions" can be given no such restricted meaning. A public institution is any organized activity created or established by law or public authority. . . . [It] is not alone those institutions of a physical character, but also all branches and departments created by law and exercising any activity or function defined by the Legislature and existing at the time the amendment was adopted, or which, if newly created by the Legislature, have not been rejected by resort to the referendum.

*State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 P. 28, 32–33 (1915).

This language was repeated by the Washington court in *State ex rel. Hoppe v. Meyers*, 58 Wash.2d 320, 363 P.2d 121, 100 A.L. R.2d 304 (1961).

The Supreme Court of Michigan followed the reasoning of the Washington court as set forth in the *Clausen* case, supra, and held that the state highway department was a state institution within the meaning of that portion of the Michigan Constitution that excepted from the referendum acts making appropriations for state institutions. *Detroit Automobile Club v. De Land*, 230 Mich. 623, 203 N.W. 529 (1925).

■ We conclude that the interpretations by the Washington and Michigan courts of their respective constitutional provisions are sound, and therefore we interpret the phrase "existing public institutions," as used in art. III, § 1 of our Constitution, in a similar manner. Accordingly, we hold that in the light of this state's long-standing commitment to the development and maintenance of an adequate rail system, as expressed in the constitutional and statutory provisions set forth above, Senate Bill 225, read together with Senate Bills 249 and 252, operates to support an existing public institution of the state. The Division of Railroads was existing on the date Senate Bill 225 was enacted and signed into law. True, it may not have had the expanded powers granted to it by Senate Bill 225, but nonetheless it was as much in existence on March 12, 1980, as was the Department of Transportation or any other existing state institution. The argument that Senate Bill 225 created a new state institution out of whole cloth and set the state upon a previously untrodden course is belied by the provisions of SDCL 49–17 and SDCL 49–17A, discussed above. To the contrary, Senate Bill 225, together with its companion bills, constitutes a plan of action, compelled by the immediacy of the demise of certain rail lines in this state, to utilize, albeit in a more expanded fashion, the state's existing institutional framework, complemented by the administrative adjunct created by Senate Bill 252, to fulfill the state's commitment to assure adequate rail transportation for its citizens. Given the history of the state's involvement in the development and maintenance of an adequate rail transportation system, it would be far too chary a reading of art. III, § 1 to say that the Division of Railroads is not an existing public institution of this state.

We recognize the fact that there may from time to time indeed be legislative constructs that are yet so evanescent or inchoate as not to warrant recognition as existing public institutions. Indeed, this Court has recognized that not all public institutions are of like character.

> We content ourselves with observing that no matter what the case may be with public institutions of a different character, a municipal auditorium is such an institution as may not exist or function without a physical plant, and that therefore an auditorium that has its being solely in an ordinance and the wishful thinking of a progressive citizenry is not an "existing public institution."

*State ex rel. Saylor v. Walt*, 66 S.D. 14, 20, 278 N.W. 12, 15 (1938).

In the light of the development of railroad legislation in this state, it would be a strained interpretation indeed to hold that the Division of Railroads has its being solely in statute and in legislative reverie.

There remains the question whether Senate Bill 225 is necessary for the support of the Division of Railroads and therefore properly within the class of laws subject to immediate implementation by legislative declaration pursuant to art. III, § 22, which provides:

> No act shall take effect until ninety days after the adjournment of the session at which it passed, unless in case of emergency, (to be expressed in the preamble or body of the act) the Legislature shall by a vote of two-thirds of all the members elected of each house, otherwise direct.

The interrelationship of these two sections of art. III was addressed by this Court in *Hodges v. Snyder*, supra:

The exception found in section 1 of article 3, names two classes of laws that are not subject to the referendum: First, such laws as are declared by the act itself to be necessary for the immediate preservation of the public peace, health, or safety of the state; and, second, such laws as are necessary for the support of the government and its existing public institutions. A law may be necessary for the preservation of the public peace, health, or safety, and still be subject to the referendum, unless the Legislature declares it necessary for the immediate preservation of the public peace, health, or safety . . . . But a law that is necessary for the support of the state government or its existing institutions is not subject to the referendum in any event, and will go into effect in accordance with the provisions of section 5111, Rev.Code 1919, unless the Legislature declares the existence of an emergency, under section 22, art. 3, Const., in which case such law will go into effect immediately or at such time as the Legislature may fix.

43 S.D. at 174–5, 178 N.W. at 577.

■ Whether an act falls within one of the two classes of laws that are excepted from the referendum by art. III, § 1 is a matter subject to judicial review. Whether an emergency exists within the meaning of art. III, § 22 is a matter solely for the Legislature to decide, however, so long as the law to which the emergency clause is attached in fact falls within one of the two excepted classes. *Hodges v. Snyder,* supra; *State ex rel. Richards v. Whisman,* 36 S.D. 260, 154 N.W. 707 (1915).

The principles governing our review of the question of the necessity of the support provided by a particular legislative act were well summarized in *State ex rel. Kornmann v. Larson,* supra:

[A] legislative declaration of an emergency is a nullity where the act could not by any fair inference be said to be in the exercise of the police power nor in support of the state government and its existing institutions. . . . This court in determining whether a law is neces-

sary for the support of the state government and its existing institutions will consider the effect upon such support of delay incident to referral and the consequences if the law is defeated. If the efficient operation of the state government would be unaffected by the delay or possible defeat, the law in such instance cannot be said to be necessary so as to prevent a referral.

While this court must give to the action of the legislature every favorable presumption, the mere fact that a statute is for the support of the state government will not preclude judicial review of the question whether the act is "necessary" for such support. This court, however, will not enter upon an ascertainment of facts through formal proof by sworn witnesses and authenticated documents to determine necessity of a statute for the support of the state government. The scope of the review is limited to what appears upon the face of the act and facts within the court's judicial knowledge.

81 S.D. at 544–545, 138 N.W.2d at 4.

■ Included within the materials that the Court may take judicial notice of are public or official records of general public interest such as legislative bills and legislative journals. 81 S.D. at 547, 138 N.W.2d at 5.

The proper scope of our review is outlined in the *Kornmann* case in the following language:

In order that this court may be justified in declaring that the act in question is not necessary for the support of the state government and its existing institutions and therefore subject to referendum it must at least appear from facts of which we may judicially notice that the conclusion is not reasonably disputable. In *Ritholz v. Johnson,* 244 Wis. 494, 12 N.W.2d 738, the court said: "When it appears from the information at hand that the facts are such as to render the conclusion to be drawn therefrom fairly debatable, the matter is for the determination of the Legislature and the court may not set up

its judgment against a legislative determination."

\* \* \* \* \* \*

We must give to the legislative determination that the law in question is necessary every favorable presumption. As ordinarily considered the existence of a rational basis for a legislative judgment of necessity is dependent upon facts within the sphere of judicial notice at the time of enactment.

81 S.D. at 548, 138 N.W.2d at 6.

In reviewing the question of the necessity of the support provided by the act in question, we must presume that the Legislature availed itself of the opportunity to determine the facts when it made its determination that the act was necessary for the support of state government and its existing public institutions. *State ex rel. Kornmann v. Larson*, supra; *State ex rel. Botkin v. Morrison*, 61 S.D. 344, 249 N.W. 563 (1933).

With these principles of judicial review in mind, we turn, then, to the information available to the Legislature at the time it enacted Senate Bill 225 and its companion bills.

That the railroad system in South Dakota is in dire condition is not open to serious question. The Chicago, Milwaukee, St. Paul and Pacific Railroad Company has been in bankruptcy since 1977.

On November 4, 1979, the President signed into law the Milwaukee Railroad Restructuring Act, P.L. 96–101 (93 Stat. 736), which provided, among other things, that no later than December 1, 1979, an association composed of representatives of national railway labor organizations, employee coalitions, and shippers might submit to the Interstate Commerce Commission a plan to convert all or a substantial part of the Milwaukee Railroad into an employee or employee-shipper owned company. On December 31, 1979, the Interstate Commerce Commission rejected a plan filed by the New Milwaukee Lines, a coalition of various Milwaukee Railroad employees and shippers, to convert a part of the Milwaukee Railroad into an employee-shipper owned company. I.C.C. Finance Docket No. 29171, December 31, 1979.

On January 16, 1980, Governor Janklow delivered a special transportation message to a joint session of the Legislature. House Journal, Fifty-fifth Session, pp. 304–324. In his message, Governor Janklow reviewed the status of rail transportation in this state, including the effect of the bankruptcy of the Milwaukee Railroad and of the potential abandonment of various segments of railroad trackage. He referred to the detrimental consequences to the economic well-being of the state should some action not be taken to prevent the wholesale abandonment of railroad trackage within the state.

On January 30, 1980, the Legislature recessed for one day for the purpose of considering the status of rail transportation within the state.

On February 25, 1980, the United States District Court for the Northern District of Illinois entered an order directing the Trustee in bankruptcy to embargo all traffic originating on certain points on the Milwaukee system as of 11:59 p. m., February 29, 1980. No. 77 B 8999, In Re Chicago, Milwaukee, St. Paul and Pacific Railroad Co., Order No. 290 A, N.D. Ill., February 29, 1980.

In addition to this documentary information, we must acknowledge the information that we share in common with the other citizens of this state, including the members of the Legislature, concerning the general decline of rail transportation within the state. Who of us has not instinctively responded to the habits of a lifetime only to realize that there is no longer any necessity of slowing for a crossing where the rails no longer run? Who of us has not observed a freight train making its slow, almost tentative, progress over bent, worn rails supported by broken, rotting ties that can only be described as the detritus of a once flourishing rail system?

As stated above, in determining whether or not a legislative act is necessary for the support of state government and its exist-

ing institutions we must give every favorable presumption to the legislative determination that the law in question is necessary. This is not to say that there are no cases in which this Court should declare an emergency clause to be of no force and effect. Indeed, this Court has not hesitated to declare an emergency clause a nullity where from the substance of the act in question there clearly could not have been an emergency. For example, in *State ex rel. Kleppe v. Steensland*, 46 S.D. 342, 192 N.W. 749 (1923), this Court held to be without force or effect an emergency clause that was attached to a bill amending the statutes relating to bastardy proceedings. In contrast to such specious use of the emergency clause, however, the 1980 Legislature was faced with facts, including the probability of the imminent abandonment of numerous rail lines within this state, from which it could validly make the determination that a situation existed that justified including an emergency clause as a part of Senate Bill 225. We members of the judiciary are not possessed of such clairvoyance as to be able to say with any degree of certainty that the consequences that the Legislature sought to avoid by the immediate implementation of Senate Bill 225 and its companion bills would not occur prior to July 1, 1980. Because the question whether Senate Bill 225 is necessary for the support of state government and its existing public institutions is fairly debatable, we should not substitute our judgment on this issue for that of the Legislature. *State ex rel. Kornmann v. Larson*, supra. Accordingly, we hold that Senate Bill 225 is necessary for the support of an existing public institution of the state and that the emergency clause is valid.

In quashing the alternative writs heretofore issued and in denying applicant the relief she seeks, we pass no judgment on the wisdom of the act in question. Whether Senate Bill 225 and its companion bills ultimately prove to represent a far-sighted legislative response to a situation of imminent public need or an ill-considered extension of the state's involvement in the rail transportation system of this state remains for the future to assess. It is enough for us to say that the citizens of this state long ago recognized the need to impose upon the popular will the limitation inherent in the delegation to our duly elected representatives of the responsibility and authority to determine what means are required to cope with problems affecting the common good that by their very nature require immediate resolution. So long as such legislative action is taken on the basis of information upon which reasonable men and women could come to the conclusion that immediate action is necessary to support the state and its existing public institutions, the courts should not interfere with that legislative determination.

In # 13079, the alternative writ of prohibition is quashed and the application for a permanent writ of prohibition is dismissed.[3] In # 13080, the alternative writ of mandamus is quashed and the application for a permanent writ of mandamus is dismissed.

FOSHEIM, J., concurs.

DUNN and MORGAN, JJ., concur specially.

HENDERSON, J., dissents.

DUNN, Justice (concurring specially).

I concur with the decision reached by the majority that the writs be quashed, and I agree that Senate Bill 225 cannot be upheld under the police powers. This was not seriously urged by the State.

3. Because of the administrative problems relating the the liability for collecting and remitting the increased taxes imposed by Senate Bill 225 that might well result from delaying the effective date of the order quashing the alternative writ of prohibition in # 13079, the order quashing that writ will be effective May 1, 1980. In so ruling, we have not overlooked SDCL 15-25-3, which provides that a party may file a petition for rehearing within twenty days after a decision has been issued in an original proceeding in this Court. Any liability for refunding the increased taxes so collected on and after May 1, 1980, in the event a rehearing is granted and our decision as expressed in this opinion is subsequently modified or reversed is an issue that can be resolved at such time as it arises.

I am also in agreement that the "necessity" and the "immediacy" of this legislation were determinations to be made by the Legislature on the basis of the substantial evidence before that body. *State ex rel. Kornmann v. Larson*, 81 S.D. 540, 138 N.W.2d 1 (1965).

This leaves the issue of whether Senate Bill 225 was for the support of state government and its existing institutions. Rather than base my decision on any one or any combination of statutes set out in the majority opinion as indicating that Senate Bill 225 is providing funding for an existing institution of state government, I would prefer to decide this case on the basis that the Constitution and the various statutes enumerated lead to one conclusion: South Dakota is committed to furnishing an adequate public transportation system for its people and its goods.

The highway system of this state was structured with the knowledge that we had at least two viable railroads traversing the state to carry a majority of the heavy freight. When one or both of these railroads cease to exist, it is not just a rail problem but a highway problem as well, and more important, it is a general problem of furnishing public transportation for the people and goods of South Dakota.

Senate Bill 225 was enacted to provide revenue to retire the bonds used to acquire, maintain and improve railroad rights-of-way and facilities appurtenant thereto. This appropriation was not to purchase rolling stock or to operate a railroad. Whether this right-of-way acquired is eventually used to rehabilitate the rails for leasing to some existing railroad or to build another highway for the additional trucks that will be necessary if the railroads cease to exist is unimportant. It remains an appropriation for the long-recognized institution of state government to fulfill the commitment of funding a public transportation system.

MORGAN, Justice (concurring specially).

I concur with most of the major premises of the well-reasoned majority opinion; however, I write specially to set forth my somewhat narrower basis for determination that the legislation, S.B. 225, meets the test for support of state government and its existing public institutions. I believe that the exceptions to the referendum provision of the constitution, Article III, § 1, should be strictly construed.[1]

I do not consider the 1978 Legislature's enactment of the measures to improve branch line railroad services (SDCL 49–17–22 through SDCL 49–17–29) or the Regional Railroad Authority Act (SDCL 49–17A) sufficient foundation to say that state-owned railroads constitute an existing public institution. I believe, however, that they demonstrate a legislative recognition and reaction to what was perceived as a very real problem which I shall comment on later.

The key enactment of that legislature upon which I rely is codified as SDCL 49–17–19 and specifically authorizes the Board of Transportation to "contract for the acquisition, construction, improvement, maintenance or operation of railroads or railroad facilities." This provision was passed as part of Chapter 343 of the Laws of 1978 and did not contain an emergency clause. No one sought to attack the concept of state-owned railroads or railroad facilities embodied in that statute. Indeed, in the present action, petitioner's attack is solely with respect to the one cent sales tax provision in S.B. 225. She has no interest in disputing the state purchase of the rail lines. She makes no attack against the other bills, S.B. 249 and S.B. 252, both of which are described in the majority opinion. As pointed out by her counsel in the responsive pleading filed herein: "S.B. 249 . . . is in no way the subject matter of this litigation which relates only to S.B. 225. . . . . Obviously revenue bonds for the funding of the activities authorized by S.B. 249 . . . and that which the legisla-

---

1. "This exception constitutes an additional grant of power to the Legislature, and, if any part of the grant is to be strictly construed, it is this exception." *State ex rel. Wegner v. Pyle*, 55 S.D. 269, 272, 226 N.W. 280, 281 (1929).

ture authorized by 225 are not interdependent even though they are in a generic sense related."[2] It is not a function of the court to expand a lawsuit beyond the perimeters of the pleadings and most certainly not into an area in which petitioner disclaims interest. The facet of the rail package which petitioner attacks falls clearly within the exception for support of an existing public institution.

I return for a moment to the enactments of the 1978 legislative session. As the majority opinion points out, this railroad emergency first became apparent when the Chicago, Milwaukee, St. Paul & Pacific took bankruptcy in 1977, and it rose to a crescendo with the action of the bankruptcy court in February of this year. I think that the 1978 legislation demonstrates a restrained but deliberate attempt of that legislature to meet the situation as it then existed and to plan for future contingencies which unfortunately have come to pass. The Governor and the legislature in the 1980 Session appear to have responded as they felt best to attempt to save the railroads at least in a limited way. That it was accomplished on the closing day of the session is accounted for by the desire of the legislators to go home and talk to the people before acting. I do not share the feeling of rancor of the petitioner who attributes to our legislature only base motives in appending the emergency clause to the disputed legislation. On the contrary, as pointed out in the majority opinion, even without the emergency clause S.B. 225 could not have been referred.

I concur in quashing the alternative writ of prohibition and dismissing the application for a permanent writ of prohibition in # 13079, and in quashing the alternative writ of mandamus and dismissing the application for a permanent writ of mandamus in # 13080.

HENDERSON, Justice (dissenting).

I respectfully dissent.

The sole question for our determination is the right of the petitioner to refer the law to a vote of the electors pursuant to Article III, § 1 of our State Constitution. That portion of the section pertinent to this inquiry provides:

The legislative power of the state shall be vested in a Legislature which shall consist of a senate and house of representatives, except that the people expressly reserve to themselves the right to propose measures, which measures the Legislature shall enact and submit to a vote of the electors of the state, and also the right to require that any laws which the Legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions . . .

As this Court noted in *Hodges v. Snyder*, 43 S.D. 166, 178 N.W. 575 (1920), there are two classes of laws that are not subject to the referendum: "First, such laws as are declared by the act itself to be *necessary* for the *immediate* preservation of the public peace, health, or safety of the state; and, second, such laws as are *necessary* for the support of the government and its existing public institutions." (Emphasis added). Id. at 174, 175, 178 N.W. at 577. As the majority opinion correctly stated, we need only concern ourselves with the state of emergency declared to exist under the second excepted class. Whether the Act could have been declared an emergency under the police powers of this state we need not here determine, for the Act itself expressly states that the imposition of such tax is "necessary for the support of state government and its existing institutions." S.B. 225, Section 24.

The question of emergency is one for the courts. *State ex rel. Richards v. Whisman,*

2. The title of Senate Bill 249 states as follows: "AN ACT ENTITLED, An Act to authorize the state railroad authorities to acquire, construct, improve, equip and finance railroad facilities by issuing revenue bonds and to declare an emergency."

36 S.D. 260, 154 N.W. 707 (1915); *Johnson v. Jones*, 48 S.D. 260, 204 N.W. 15 (1925). While this Court must resolve any doubt in favor of the legislature's declaration of emergency, the mere fact that a statute embodies language "for the support of state government and its existing institutions" will not preclude judicial review of the question whether the act is, in fact, "necessary" for such support. *State ex rel. Kornmann v. Larson*, 81 S.D. 540, 138 N.W.2d 1 (1965) and *State ex rel. Wegner v. Pyle*, 55 S.D. 269, 226 N.W. 280 (1929).

The test set forth by this Court in determining whether a law is necessary is: "What will be the effect upon the state government if the law is suspended until a vote can be taken, or what will be the effect if it is finally defeated?" *State ex rel. Wegner v. Pyle*, supra at 280, 226 N.W. at 284. According to *Wegner*, "If the actual practical support of the government is unaffected by the delay or possible final defeat of the measure, then it cannot be said to be necessary so as to prevent its reference to a vote." Id. at 277, 226 N.W. at 283. Notwithstanding that the scope of our review is limited to what appears upon the face of the act and facts within the Court's judicial knowledge, *State ex rel. Shade v. Coyne*, 58 S.D. 493, 237 N.W. 733 (1931), it is clear that South Dakota will not derive one dollar of income for its general support through implementation of this Act, and therefore, the actual practical support of state government will be unaffected by the delay or possible final defeat of the measure.

The legislature has no right to disregard Article III, § 1 or to nullify it by attaching an emergency clause to a law that in fact is not an emergency. *Johnson v. Jones*, supra. To shield this measure under the guise of emergency legislation is to in effect usurp the power vested in the people to ratify or repudiate it as they see fit. A precious constitutional right is being stripped from the people. The majority opinion embraces a warped extension of Article III, § 1.

The Act complained of imposes upon the people of this state an additional one per-

cent sales tax to raise revenue for the sole purpose of providing for the acquisition, operation, maintenance and improvement of public rail lines, and the acquisition and disposition of any and all rights-of-way, land, facilities, fixtures and appurtenant structures, services and equipment, determined by the division of railroads to be necessary or appropriate. Ninety-eight percent (98%) of the revenue derived from the increase in taxes shall be credited to the railroad authority fund; two percent (2%) shall be credited to the general fund. The Act, by specifically earmarking that ninety-eight percent of the revenue is to be contained in the railroad authority fund and not the general fund, negates the concept that such tax is necessary for the support of state government in meeting its impending obligations. In addition, the state concedes that the two percent that is to be diverted into the general fund is to cover administrative costs incurred in its implementation. The net gain for the general support of South Dakota is zero dollars. Thus, it is apparent that the emergency declared to exist is an artificial label and obviously not for the support of the state government and its existing institutions as previously defined by this Court. "The word 'support' as used in the constitutional provision under consideration [Article III, § 1] does not extend beyond the furnishing of funds or revenue to meet the needs and requirements of the state." *Engelcke v. Farmers' State Bank of Canistota*, 61 S.D. 92, 99, 246 N.W. 288, 291 (1932). In other words, the word "support" does not encompass revenue measures to meet new and additional needs and requirements of the state created by a law which places the state into an altogether new, bold economic venture. Having declared that such Act is necessary for the support of state government and its existing institutions, the state cannot now rely on the police power for justifying such action, claiming that it is necessary for the "economic health" of the state. *Engelcke v. Farmers' State Bank of Canistota*, supra. The actual practical support of state government as we have come to know it will not cease or be affected by the delay or

possible defeat of the measure in a referendum. The state is not, and never has been, actively engaged in the activities encompassed by this legislation. Thus, this Act is not necessary for the support of the state. It is one thing to regulate a railroad; it is another to plunge into its actual operation and acquisition. If this Court were to follow the reasoning of the state's position, the Public Utilities Commission, which is a regulatory body over the public utilities of this state, could acquire the transmission lines and the capital improvements of any utility of this state. The majority opinion establishes a dangerous precedent.

This Court has held in the past that emergencies are restricted to appropriation acts *necessary* for the support of state government and its existing institutions, which thrusts a heavy burden upon those asserting that the people of this state should be prevented and barred from passing on the validity of the legislation. *Johnson v. Jones,* supra. I fail to see where privately owned and operated railroads have ever achieved the status of an existing state public institution. Article XVII, § 15 * declares railroads public highways for the purpose of regulation and controlling the rates of charges for freight, not for the purpose of securing railroad right-of-way, either before or after abandonment.

Neither does the division of railroads created within the Department of Transportation pursuant to S.L.1975, ch. 26, § 1 (SDCL 1–44–17, 18) comport with that of an existing institution for purposes of Article III, § 1. The majority opinion relies heavily on *Hoppe v. Meyers,* 58 Wash.2d 320, 363 P.2d 121 (1961), in construing the division of railroads as an existing institution, designed to effectuate the implementation of this emergency legislation. According to *Hoppe,* an existing institution includes: "[a]ll branches and departments created by

law and exercising any activity or function defined by the legislature and existing at the time the amendment was adopted, or which, if newly created by the legislature, have not been rejected by resort to referendum." Id. at 326–327, 363 P.2d at 125. While I would concede that the division of railroads was in existence at the time of S.B. 225's adoption, it never existed in the capacity contemplated by the Act complained of. Since the time of its inception, the division of railroads has never been empowered to function in the acquisition and ownership of property for the purpose of engaging in directly or indirectly, the private business of maintaining a railroad. To the contrary, its function was merely that of conducting research on basic railroad problems; to plan and assist in the development and coordination of rail transportation; and to develop and maintain a federal-state relationship of programs relating to railroads. SDCL 1–44–18. From its birth, its functions have militated against a state of emergency or that of government ownership. The state cannot look to the division of railroads as an existing institution, whose internal makeup never has been that which this Act now envisions it to be. Furthermore, the Act creates a railroad board consisting of seven members, which must approve the division of railroad's actions in the matters of "operation, management, finance, marketing, and development of rail service over all properties and facilities acquired, leased, or controlled by the state." S.B. 225, Section 9. The railroad board plays an integral role in this legislative scheme: It is a newly created entity, separate and apart from the division of railroads. The record reveals, and the argument of the state supports, the judicially noted fact that the Act creating the South Dakota Railroad Authority was endorsed by the Secretary of State on the same evening

---

* Article XVII, § 15 provides:

*Railways and rail companies declared public highways and common carriers—Regulation of rates.* Railways heretofore constructed or that may hereafter be constructed, in this state are hereby declared public highways, and all railroad and transportation companies are declared to be common carriers and subject to legislative control; and the Legislature shall have power to enact laws regulating and controlling the rates of charges for the transportation of passengers and freight as such common carriers from one point to another in this state.

and within a short period of time prior to the endorsement of the "railroad package." The record fails to demonstrate that the railroad board was implemented by appointment and installation of the seven members, or with the advice and consent of the Senate prior to the passage of S.B. 255. Thus, at the time of the Act's endorsement, there was no existing institution to be supported, for the newly-created railroad board was neither in force nor in effect. *See Asplund v. Marjohn Corp.*, 66 N.J.Super. 255, 168 A.2d 844 (1961); *State v. State Toll Bridge Authority*, 210 Ga. 690, 82 S.E.2d 626 (1954); and *In re Harrington's Estate*, 151 Neb. 81, 36 N.W.2d 577 (1949). Even under *Hoppe*, it cannot be considered an existing institution because to establish it as such, it must "have not been rejected by resort to referendum."

Finally, the majority opinion alludes to the fact that this state has established a program directing the Transportation Commission to take action in improving branch railroad service within the state as evidenced by the passage of Chapter 342, S.L. 1978 (SDCL 49–17–22 through 49–17–29). While this legislation authorizes state aid to railroad construction and maintenance, it does not, however, embrace the concept of statewide, total participation and ownership in such an undertaking as the majority opinion implies. On the contrary, SDCL 49–17–25 expressly states:

> Agreements entered into requiring expenditure of state funds shall also require the expenditure of funds by rail users benefiting from the proposed improvements and the expenditure of funds or the provision of services, by the railroad corporation party to such agreement. The ratio of participation by state rail users and railroad corporations shall be determined by the department of transportation for each branch line or branch line segment to be upgraded.

Furthermore, the reference made to SDCL 49–17–19, which authorizes the Transportation Commission to "contract for the acquisition, construction, improvement, maintenance or operation of railroads or railroad facilities" is severely limited in its present-day application. The repeal of Chapter 49–18, Railroad Indebtedness; Chapter 49–19, Location and Construction of Railroads; and Chapter 49–20, Railroad Right of Way set the stage for granting the Transportation Commission intervention in these matters which have traditionally been that of the private railroad corporations. These repeals, however, do not go into effect until July 1, 1981. Therefore, the Commission's powers as delineated in SDCL 49–17–19 are in reality a legal fiction.

This purported emergency legislation does not fall within the exception; the majority opinion, by sanctioning such label, is effectively denying the people of this state of their reserved right to ratify or repudiate this legislation as they deem fit. The power conferred upon the legislature is a grant of power limited and defined by terms of the grant. The power granted to the legislature is restricted and limited by the right of the people to ultimately adopt or reject any legislative enactment, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, or the support of the state government and its existing institutions. The court noted in *State ex rel. Wegner v. Pyle*, supra, that: "This exception constitutes an additional grant of power to the Legislature, and, if any part of the grant is to be strictly construed, it is this exception." 55 S.D. at 272, 226 N.W. at 281. This exception, to the contrary, has now, through a strained reading, been given a liberal construction by the majority opinion.

We have before us the product of early-morning hour, fevered legislation which has been ingeniously fostered and guided through the legislature by the executive branch of government. Having been aggrieved by the actions of the legislative and executive branches of government, the petitioner has every right to come to the judicial branch of government for redress. No rancor should be attributed to this petitioner. As a taxpayer she is, in law, a proper party to this action. *State ex rel. Schilling v. Menzie*, 17 S.D. 535, 97 N.W. 745 (1903). The Act does not finance rising

government expenditures caused by inflation, nor does it increase state aid to local governments. It was not intended to; rather, its purpose is to place South Dakota as a forerunner in the state-owned railroad business. It is patently clear that the Act is not, in fact, necessary for the general support of state government and its existing institutions. This state has never been engaged in such an enterprise. State government operations as we know them today will not grind to a halt if the tracks are subsequently removed. Were the opposite true, government would long ago have ceased as hundreds and thousands of miles of railroad track in South Dakota have fallen into nonuse and disrepair, as the majority opinion so nostalgically notes.

Historically, through legislation and decisions of this Court, all substantial schemes of internal development or improvement of economic facilities have been recognized as nonemergency matters and the subject of constitutional amendments approved by the people of this state. *See State ex rel. Kornmann,* supra, (dissenting opinion). The Court in *Wegner* viewed the distribution of the burden of taxation as an economic question which the people intended to keep within their control so far as possible without slowing the wheels of government. The right of the people to adopt or reject any legislative enactment should not be unconstitutionally interfered with by any branch of government. To deny the people the right to vote on this major economic issue when they plainly have the right to refer this law by constitutional safeguards reserved unto them, is contrary to our State Constitution, history of this state, precedent of this Court, and is violative of the rights of a free people. As the Court so aptly stated in *Wegner*:

> There can be no power in the Legislature to conclude by its action a reserved right belonging to the people. To so hold would be to sanction a usurpation of power and make the Legislature supreme. . . . If it is necessary, the voters can adopt it.

55 S.D. at 276, 277, 226 N.W. at 283.

Therefore, as petitioner has no plain, speedy or adequate remedy at law, I would grant both the writ of prohibition, prohibiting the Secretary of Revenue from imposing the one percent sales tax, and prohibiting the Director of Railroads from acquiring railroad property; and I would grant the writ of mandamus to compel the Secretary of State to file a referendum petition.