## In re J.B. VAN SCIVER COMPANY, Debtor.

### J.B. VAN SCIVER CO., Plaintiff,

v.

### WILLIAM COOPER ASSOCIATES, INC., also known as Cooper Associates, Incorporated and Martin Sameloff, Defendants.

Bankruptcy No. 83–00103G.
Adv. No. 85–0065G.

United States Bankruptcy Court, E.D. Pennsylvania.

May 19, 1987.

As Amended May 22, 1987.

Andrew D. Bershad, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for debtor/plaintiff, J.B. Van Sciver Co.

John A. Kenneff, Goodman & Kenneff, Millersville, Pa., for defendants, William Cooper Associates, Inc. a/k/a Cooper Associates, Inc., and Martin Sameloff.

Albert A. Ciardi, Ciardi, Fishbone and DiDonato and Marvin Krasny, Adelman Lavine Krasny Gold & Levin, Philadelphia, Pa., for Creditors' Committee.

## OPINION

BRUCE FOX, Bankruptcy Judge:

This is an action for damages for breach of a real estate sales agreement brought by the debtor in possession, J.B. Van Sciver Co. ("Van Sciver"), against William Cooper Associates, Inc. ("Cooper Associates") and Martin Sameloff ("Sameloff").

Van Sciver owned a parcel with a building located in Lancaster, Pennsylvania ("the property"), which it put on the market in September 1982. In August 1984, it entered into an agreement of sale ("the agreement") with Cooper Associates. Cooper Associates was not able to make settlement on the property by November 30, 1984, as required by the agreement. Van Sciver contends that it agreed thereafter to extend the date of settlement to January 4, 1985 in exchange for certain additional promises. After Cooper Associates again failed to make settlement by the new date, Van Sciver terminated the agreement and subsequently sold the property to a new buyer with approval of this court and over defendant's objection.

Van Sciver is seeking damages for defendant's alleged breach under the agreement and the alleged subsequent extension agreement. Van Sciver also seeks judgment against Sameloff on a promissory note given in connection with the transaction. The defendants' primary response is that they have no liability due to the mortgage contingency clause contained in the agreement.

## I. FINDINGS OF FACT

1. Van Sciver, the debtor-plaintiff herein, was the owner of a parcel of land with a building at West King and South Mulberry Streets, Lancaster, Pennsylvania until September 17, 1985.

2. The defendants are Cooper Associates, a Pennsylvania corporation, and Sameloff, Secretary/Treasurer of Cooper Associates.

3. In September 1982, Van Sciver engaged the services of Coldwell Banker

Realvest ("Coldwell Banker") in order to find a purchaser for the property.

4. Van Sciver entered into an agreement on or about August 7, 1984, to sell the property to Cooper Associates for $390,000.00.

5. The agreement was drafted by defendants' agent.

6. The agreement of sale provided for Cooper Associates to pay a $10,000.00 deposit and to give a promissory note for $29,000.00 at the time of the signing of the agreement.

7. Paragraph 5B. of the agreement contained a mortgage contingency clause consisting of three sentences as follows:

This agreement is contingent upon Buyer obtaining a loan commitment in an amount of not less than $1,500,000.00 from a commercial lending institution on or before October 31, 1984 at a rate of not greater than prime. Loan application is to be made within 10 days of the execution of this Agreement by the Seller. In the event Buyer is unable to obtain this loan commitment and all required approval incidental thereto by October 31, 1984 this Agreement shall be null, void and of no further force or effect and all sums and notes paid or delivered hereunder shall be returned to the Buyer.

8. The agreement provided for settlement to be made on or before November 30, 1984.

9. The agreement also provided that: [In the event of the buyer's default,] all deposit money and other sums paid by the Buyer on account of the purchase price, whether required by this agreement or not, may be

(1) Retained by the Seller on account of the purchase, or

(2) As moneys to be applied to the Seller's damages, or

(3) As liquidated damages for such breach;

as the Seller may elect, and in the event that the Seller elects to retain the moneys as liquidated damages in accordance with paragraph 16(3), the Seller shall be released from all liability or obligations and this agreement shall be NULL AND VOID and all copies will be returned to the Seller's agent for cancellation.

10. The agreement was approved by this court.

11. On August 30, 1984, Cooper Associates, as required under the agreement, executed and delivered to Van Sciver's agent, Coldwell Banker, a promissory note in the face amount of $29,000.00. The promissory note contains the same condition as paragraph 5B. of the agreement of sale (*see* Finding No. 7 above) except that it lacks the second sentence of paragraph 5B of the agreement.

12. On September 22, 1984, Sameloff personally joined in the execution of the promissory note as a co-maker thereof.

13. On or about September 3, 1984, Cooper Associates submitted a $10,000.00 deposit check to Coldwell Banker. When the check was deposited by Coldwell Banker, it was returned by the bank as "unpaid," due to the "account [being] closed."

14. Shortly thereafter, Cooper Associates paid $5,000.00 of the deposit and promised that an additional $5,000.00 would be paid in the future to complete the $10,000.00 deposit required by the agreement.

15. The additional $5,000.00 was never paid by Cooper Associates, although it was requested by Coldwell Banker on several occasions.

16. In the ten day period following the signing of the agreement, the Cooper Associates made oral inquiries regarding financing at two banks. It also orally contacted a brokerage company called Creative Financing, Inc. ("Creative Financing").

17. Cooper Associates made no written loan applications to any commercial lending institutions or brokers within the ten day period following the signing of the agreement. No written loan application of any kind was made until October 25, 1984, when Cooper Associates submitted a written application to Creative Financing.

18. Cooper Associates designated Sameloff as the individual responsible for obtain-

ing financing for the purchase of the Van Sciver property. At trial, he did not recall the names of the bank representatives with whom he discussed Cooper Associates' need for financing. He was uncertain when he submitted a loan application to Creative Financing and he did not have copies of any of the documents he claims that he sent Creative Financing.

19. Sameloff's credibility was suspect due to his poor memory and contradictory statements. At trial, he stated that both banks he approached for loans immediately rejected his proposals while at his deposition he stated that one bank was initially receptive to his request for financing.

20. Prior to November 30, 1984, no potential lender contacted Coldwell Banker or Van Sciver to make arrangements to gain access for a property inspection.

21. Prior to November 30, 1984, Cooper Associates took no action other than that described in ¶¶ 16–17 to obtain financing for the purchase of the subject property.

22. Prior to November 30, 1984, Cooper Associates advised Coldwell Banker that the financing was in place and that it could go to settlement on November 30, 1984.

23. Cooper Associates failed to make settlement for the property on or before November 30, 1984, even though Van Sciver was ready, willing and able to make settlement on that date.

24. Cooper Associates and Sameloff did not pay the promissory note on or before November 30, 1984. To this date, the note has not been paid.

25. Some time during the week of November 30, 1984, Van Sciver's attorney, Horace A. Stern, Esquire ("Stern") received a telephone call from Sameloff in which Sameloff stated that he and William H. Cooper ("Cooper"), the president of Cooper Associates, would like to meet with Stern to discuss the possibility of extending the terms of the agreement. They made an appointment to meet on December 4, 1984 at Stern's office.

26. On December 4, 1984, Sameloff, Cooper, and Stern met at Stern's office to discuss the terms of an agreement to ex-

tend the settlement date. Sameloff and Cooper did not have counsel present.

27. At the end of the meeting it was agreed that Stern would draft a document ("proposed extension agreement") containing the terms discussed during the meeting and that Stern would send it to defendants' attorney, John A. Kenneff, Esquire ("Kenneff").

28. The proposed extension agreement provided for the extension of the settlement date to January 4, 1985 in consideration for which Cooper Associates would be obliged to pay an additional $25,000.00 as a deposit, place insurance on the property and waive the mortgage contingency clause in the agreement.

29. After Van Sciver's president signed the proposed extension agreement, Stern sent it to Kenneff.

30. The proposed extension agreement was never returned to Stern.

31. Kenneff drafted a similar extension agreement with some modifications, one of them being the absence of a waiver of the mortgage contingency clause by the defendants. Kenneff's draft was signed by Cooper, but not by Sameloff, and was never sent to Stern.

32. Van Sciver did not put the property back on the market after November 30, 1984 because it was negotiating with Cooper Associates for an extension agreement.

33. Cooper Associates did not perform any of the obligations required of them by the proposed extension agreement drafted by Stern.

34. On January 7, 1985, Stern advised Cooper and Sameloff in writing that Van Sciver regarded the agreement of sale and any extension thereof as terminated due to the defendants' breach and stated that Van Sciver would take appropriate action to protect its interests, including placing the property back on the market for sale.

35. On January 24, 1985, Kenneff informed Stern in writing that he had been advised by Cooper that Cooper Associates had been unable to obtain financing and that, pursuant to the agreement, all funds

on deposit were to be returned to Cooper Associates. The $5,000.00 deposit was not returned.

36. Van Sciver put the property back on the market some time in the spring of 1985 through the same broker, Coldwell Banker.

37. On July 10, 1985, H & H Enterprises, a partnership in Lancaster, Pennsylvania, entered into an agreement to buy the property for $200,000.00. The terms of the agreement were equivalent to those offered to and accepted by Cooper Associates (other than price).

38. Cooper Associates filed an objection to the sale of the property to the new buyer on the grounds that the price was too low and they were willing and prepared to pay more for the property. This court dismissed Cooper Associates' objection.[1]

39. On September 17, 1985, settlement was held between Van Sciver and H & H Enterprises on their agreement of sale.

40. Van Sciver suffered monetary damages of $185,000.00 as a result of Cooper Associate's failure to go to settlement, calculated as follows: $390,000.00 (sales price) minus $200,000.00 (consideration received in September 1985) minus $5,000.00 (deposit paid by defendants).

## II. CONCLUSIONS OF LAW

1. An action for breach of a court approved, post-petition real estate sales agreement is a core proceeding.

2. Cooper Associates breached the agreement of sale by failing to pay Van Sciver the purchase price for the property required by the agreement and by failing to go to settlement.

3. By agreement of the parties, defendants have the burden of proving those facts which entitle them to invoke the mortgage contingency clause of the agreement and the promissory note.

4. The defendants have not met their burden of proving that they made a loan

application within ten days of the execution of the agreement and otherwise made good faith efforts to obtain the needed financing.

5. Van Sciver and Cooper Associates did not enter into a contractually binding extension agreement on December 4, 1984 or thereafter.

6. Cooper Associates is liable to Van Sciver for $185,000.00 plus interest from September 17, 1985.

7. As co-maker on the promissory note, Sameloff is jointly and severally liable to Van Sciver, but only in the amount of $29,-000.00, plus interest from September 17, 1985.

## III. DISCUSSION

### A. *Jurisdiction*

■ The threshold question in this case involves the nature of this court's jurisdiction over the claim asserted by Van Sciver. Van Sciver asserts that because the subject agreement of sale was approved by this court's order of September 24, 1984, this action is a core proceeding under 28 U.S.C. § 157(b)(2)(O). Without explanation, the defendants claim that this matter is a related proceeding. They then argue that this court lacks all jurisdiction because this proceeding is subject to mandatory abstention under 28 U.S.C. § 1334(c)(2).

I conclude that this action is a core proceeding. I am mindful that Van Sciver's cause of action is a traditional state law contract claim and that "proceedings which involve a cause of action created solely by state law, brought by or on behalf of the debtor, and which do not otherwise fall within the provisions of 28 U.S.C. § 157(b)(2)(B)–(N), are noncore matters." *In re Athos Steel and Aluminum, Inc.,* 71 B.R. 525, 534 (Bankr.E.D.Pa.1987). *See also Acolyte Electric Corp. v. City of New York,* 69 B.R. 155 (Bankr.E.D.N.Y.1986). However, this proceeding exhibits two

---

1. There were two hearings before Chief Judge Goldhaber. At the first hearing, Sameloff and Cooper stated their intention to pay $250,000.00 for the property. As a result, the court continued the hearing for two weeks. At the second hearing, Cooper and Sameloff were unable to demonstrate their ability to complete the sale for $250,000.00. The court denied their request for another continuance and dismissed their objection.

characteristics which distinguish it from an ordinary related proceeding.

First, the litigation arises from a court order which authorized the debtor to sell the subject property. An order approving the sale of property to a non-creditor is a core matter under 28 U.S.C. § 157(b)(2)(N). This proceeding may be characterized as an outgrowth of the court's order and, as such, would also be a core matter. *See In re National Equipment & Mold Corp.*, 71 B.R. 24 (Bankr.N.D.Ohio 1986) (controversy arising out of debtor's exercise of power to obtain credit, with court approval pursuant to 11 U.S.C. § 364, is a core proceeding); *In re Franklin Computer Corp.*, 60 B.R. 795 (Bankr.E.D.Pa.1986) (debtor's claim for breach of agreement approved by the court and incorporated by reference in confirmed amended plan of reorganization is a core matter pursuant to 28 U.S.C. § 157(b)(2)(M)) (alternate holding); *accord, In re Grayline of Boston, Inc.*, 62 B.R. 811 (Bankr.D.Mass.1986). *See also Matter of Pester Refining Co.*, 66 B.R. 801 (Bankr.S. D.Iowa 1986).

Second, the claim arose post-petition, in connection with the debtor's efforts to liquidate an asset. Extremely significant is the fact that under the prior Bankruptcy Act, bankruptcy courts had summary jurisdiction to determine controversies based on contracts for sale of property of the estate. *See* 4B *Collier on Bankruptcy* ¶ 70.98, at 1202, 1206 n. 21 (14th ed. 1978). It is unlikely that, in enacting 28 U.S.C. § 157(b)(2) in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), Congress intended to narrow the traditional jurisdiction of the bankruptcy court in matters of this nature. In these narrow circumstances, a state law claim might also be characterized as a core matter pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

 Since I have determined this matter to be a core proceeding, I will enter a binding judgment pursuant to 28 U.S.C. § 157(b)(1).[2]

### B. *The Mortgage Contingency Clause*

 The main dispute in this case centers on the application of the mortgage contingency clause in the parties' agreement of sale. Van Sciver argues that Cooper Associates did not apply for financing within ten days of the execution of the agreement and therefore, may not invoke the escape clause. The defendants argue that they made a good faith effort to obtain financing, including at least two oral loan applications within the ten day period. The parties agree that the defendants have the burden of proving that the mortgage contingency clause is operative in this case.

A mortgage contingency clause is ordinarily inserted for the benefit of the purchaser in a real estate sales agreement. *See Tieri v. Orbell*, 192 Pa.Super. 612, 162 A.2d 248 (1960). In many jurisdictions, courts have held that under such a provision, the buyer has an implied obligation to make a good faith or reasonable effort to obtain financing. *E.g., Honkomp v. Dixon*, 97 Ill.App.3d 476, 52 Ill.Dec. 740, 422 N.E.2d 949 (1981); *Billman v. Hensel*, 181 Ind.App. 272, 391 N.E.2d 671 (1979); *Kraft v. Baker*, 377 So.2d 871 (La.App.1979); *Cone v. Daus*, 120 A.D.2d 788, 501 N.Y. S.2d 523 (1986); *Manning v. Bleifus*, 272 S.E.2d 821 (W.Va.1980); Annot., 3 A.L.R.3d 880 (1977). The foregoing principle has also been recognized in Pennsylvania. *Newman v. Sablosky*, 268 Pa.Super. 85, 407 A.2d 448 (1979); *cf. Robert F. Felte, Inc. v. White*, 451 Pa. 137, 302 A.2d 347 (1973) (while sufficiency of buyer's efforts to obtain financing was not at issue, court expressly noted that buyer made good faith effort); *Ormond Realty v. Ninnis*, 341 Pa.Super. 101, 491 A.2d 169 (1985) (same).

**2.** As a core matter, the action is not subject to mandatory abstention. *See* 28 U.S.C. § 1334(c)(2). I note also that mandatory abstention would not apply because there was no action previously commenced in state court. Nor is a post-trial motion for mandatory absten-

tion "timely." *See In re Pacor, Inc.*, 72 B.R. 927 (Bankr.E.D.Pa.1987). *See generally In re IQ Telecommunications, Inc.*, 70 B.R. 742 (N.D.Ill. 1987) (involving "timeliness" requirement for motion to withdraw reference under 28 U.S.C. § 157(d)).

In the case at bench, the mortgage contingency clause, *see* Finding of Fact No. 7, consists of three sentences. The first and third sentences create the contingency and state the consequences that follow if the contingency does not occur. The meaning of the second sentence, requiring that a loan application be made within ten days, is less clear. It can be construed as a buyer-protective provision which defines the buyer's duty of good faith *solely* as the submission of an application within the ten day period. It can also be construed as a seller-protective provision which amplifies the general good faith duty by the specific requirement that the search for financing commence within ten days. *See generally Session v. Yack,* 18 D. & C.2d 333 (C.P.Phila.1958) (deadline for obtaining mortgage approval could be intended for benefit of both buyer and seller). The record reflects that the language was drafted by the buyer-defendants' agent. The ambiguity should be construed against the drafter of the contract. *E.g., Hyster Credit Corp. v. O'Neill,* 582 F.Supp. 414 (E.D.Pa.1983) (citing Pennsylvania law); *In re Dublin Properties,* 27 B.R. 506 (Bankr.E.D.Pa.1983) (same). *See also In re United Nesco Container Corp.,* 68 B.R. 970 (Bankr.E.D.Pa. 1987). Therefore, I will interpret the "ten day application" requirement to be a nonexclusive component of the defendants' duty, under the mortgage contingency clause, to seek financing in good faith.

As a result of my construction of the agreement, the mortgage contingency clause cannot be successfully invoked unless I find that: (1) the buyer made good faith, reasonable efforts to obtain financing during the period of time between the execution of the agreement and the settlement date *and* (2) the buyer initiated those efforts by submitting a loan application to a commercial lender within ten days of the execution of the agreement. I turn first to the initial requirement set forth above.

■ Whether a buyer has made a good faith or reasonable effort to obtain financing is a question of fact. As one court has observed:

> What might be "reasonable efforts" in one context might be manifestly unreasonable in another. This court has no empirical standard which would resolve the [question] ... [T]he cases which consider the issue of "reasonable efforts" focus on individual circumstances surrounding the Buyers' endeavors to obtain financing.

*Honkomp v. Dixon,* 97 Ill.App.3d at 480, 52 Ill.Dec. at 743, 422 N.E.2d at 952 (citations omitted). *See also Phillipe v. Thomas,* 3 Conn.App. 471, 489 A.2d 1056 (1985); *Biersbach v. Landin, Ltd.,* 454 So.2d 779 (Fla.App.1984); *Alice Blake, Inc. v. Hoffman,* 620 S.W.2d 20 (Mo.App.1981); *Manning v. Bleifus.*

■ Based on the record before me, I conclude that the defendants have not met their burden of establishing their good faith efforts to obtain financing under the agreement. Particularly since the buyer drafted the mortgage contingency clause, it is appropriate to construe the term "loan application" to include a requirement that the application have some formal characteristics.[3] This is not to say that the application need necessarily be in writing, but there should be a showing that the request for financing was made in a manner which would ordinarily cause a lender to seriously evaluate the request. A casual, brief discussion with a bank employee would not suffice.

Here, the only evidence regarding the financing efforts of Cooper Associates was the testimony of Sameloff and Cooper. They stated that they went to two banks within the ten day period, but provided surprisingly little detail about those activities. Sameloff, who had been delegated responsibility for obtaining financing, did not recall the name of the bank officers with whom he spoke. Cooper remembered the name of one bank officer. Sameloff provided no details of his conversations with the bank officers. He recounted no

---

3. The verb "apply" is defined, *inter alia,* as follows: "to make a formal request or petition, usually in writing to a court, officer, board or company...." *Black's Law Dictionary* 91 (5th ed. 1979).

explanation why the banks were uninterested in financing the purchase and rehabilitation of the property. Cooper, who was in the courtroom while Sameloff testified,[4] was able to recall only that one bank officer stated the bank would not get involved in a project where it "might be in jeopardy," while the other bank required personal guaranties which the defendants could not or would not supply.[5]

More striking than the meager information provided by Sameloff and Cooper is the evidence not presented. It is undisputed that no written application was submitted. Apparently, no loan application fees were paid. At no time prior to the November 30, 1984 settlement date did a prospective lender contact Van Sciver or its agent seeking access to the property for an inspection. Nor were any representatives of either bank called to testify to buttress the account of Sameloff and Cooper. In short, there is no objective indicia that a serious effort was made to apply for financing and I am unwilling to find, based on the indefinite testimony presented, that the defendants' burden has been met. *Cf. Saltzman v. McCombs*, 71 Nev. 93, 281 P.2d 394 (1955) (court found buyer made good faith effort to secure financing despite absence of formal, written application based on letter sent by bank officer at the time at issue and his unequivocal testimony in court that the buyer would not have qualified for loan).

Sameloff and Cooper also testified that they also contacted a loan broker named Creative Financing within the ten day period following the execution of the agreement and they submitted a formal application at a later date. This evidence, however, does little to assist the defendants in their efforts to demonstrate a reasonable, good faith effort to obtain financing. Initially, I observe that the agreement referred to an application to a "commercial lending institution." One court has defined the term "lending institution" in the context of a mortgage contingency clause as "an established public or private financing body, incorporated or otherwise recognized under appropriate law." *Asplund v. Marjohn Corp.*, 66 N.J.Super. 255, 168 A.2d 844, 849, *cert. denied*, 35 N.J. 61, 171 A.2d 147 (1961). While use of loan brokers may be appropriate in satisfying the buyer's duty to exercise reasonable, good faith efforts to obtain financing, some evidence regarding the role of brokers in financing transactions like the one at issue, as well as the expertise of Creative Financing in particular,[6] would have been helpful. Moreover, a completed loan application was not received by Creative Financing until October 25, 1984, over two and one half months after the agreement was signed and slightly more than one month before the scheduled settlement date. No satisfactory explanation was provided for the delay in the submission of the formal application to Creative Financing. No evidence was introduced regarding the efforts made by Creative Financing to obtain financing on defendants' behalf. In the end, the defendants seemed to rely on an expectation that the deposition testimony of Baola Gould, a Creative Financing representative, would fill in these details. At the end of the trial, the record was left open for the submission of the deposition, but it was never filed.

▆ In sum, given the nature and size of the transaction involved in this case, it seems more likely than not that good faith efforts to obtain financing would have generated some concrete evidence of those efforts. I find the defendants' explanations for the paucity of evidence unconvincing. Therefore, I conclude that they did not meet their burden of proof[7] and may not

---

**4.** The parties made no request to exclude witnesses. *See* Fed.R.Evid. 615.

**5.** Prior to trial, Sameloff testified at his deposition that one bank employee seemed receptive to Cooper Associates' financing proposal. If so, why was there no formal application submitted? Of course, at trial, Sameloff testified that both of his initial inquiries to banks were rejected.

**6.** There was testimony that Creative Financing had worked with Cooper Associates on other "projects," but no further detail was provided.

**7.** This finding is also conclusive with respect to Sameloff's personal liability on the promissory note, *see* Findings of Fact Nos. 12–13. The evidence clearly establishes that Sameloff per-

invoke the mortgage contingency clause in the agreement.[8] *Accord, Beekay Realty Corp. v. Cayre,* 256 So.2d 539 (Fla.App.), *cert. denied,* 263 So.2d 207 (1972). It follows that their failure to pay the purchase price and go to settlement was a breach of the agreement of sale.

## C. *The Measure of Damages*

Damages for breach of a real estate agreement of sale are measured by the difference between the contract price and the market value of the property. If the property has been resold, the measure of damages is the difference between the price agreed to be paid by the breaching purchaser and that obtained on the resale, provided the resale was upon equivalent terms (other than price). *See In re Stardust Inn, Inc.,* 70 B.R. 888 (Bankr.E.D.Pa. 1987); *Harris v. Dawson,* 479 Pa. 463, 388 A.2d 748 (1978); Comment, *The Uniform Land Transactions Act: Pennsylvania Property Law and Sellers' Remedies for Breach of Contract for Sale of Real Estate,* 55 Temple L.Q. 577, 591 & authorities cited therein (1982); 32 *Pennsylvania Law Encyclopedia,* Sales of Real Property § 171 (1960).

In this case, as set forth in Finding of Fact No. 38, I calculate Van Sciver's damages to be $185,000.00.[9] Van Sciver contends, however, that it is entitled to an additional $27,603.43 in damages. It asserts that under the terms of an agreement reached in the office of its attorney, Horace Stern, on December 4, 1984, Cooper Associates agreed to apportion all real estate taxes and water/sewer rents to the date of settlement and to insure the property for not less than $450,000.00; in return, Van Sciver's agreed to extend the settlement date from November 30, 1984 to January 4, 1985. Van Sciver submits Cooper Associates is liable for the $27,643.43 incurred in taxes and water/sewer rents from November 30, 1984 to September 17, 1985, when the property was sold to another buyer. I reject Van Sciver's argument because I find that the parties did not enter into a binding contract to extend the settlement date.[10]

Even when an agreement provides that "time is of the essence," as did the agreement of sale in this case, the parties may, by agreement or by their conduct, waive the deadline for settlement. *DiGiuseppe v. DiGiuseppe,* 373 Pa. 556, 96 A.2d 874 (1953). In this case, after the settlement

---

sonally joined with Cooper Associates as co-maker of the promissory note. Payment of the note was also conditioned upon Cooper Associates' ability to obtain financing; the only difference is that the contingency clause in the note lacks the requirement that a loan application be made within ten days of the execution of the agreement of sale. It is undisputed that the promissory note has not been paid. Sameloff's only defense to his liability on the note is the invocation of the mortgage contingency clause. This defense is without merit due to the lack of a reasonable, good faith effort to obtain the financing.

8. As an alternative basis for my conclusions, I find that the evidence was insufficient to establish that a loan application was made to a commercial lending institution within ten days of the signing of the agreement. I am not convinced that the requests for financing to the two banks were made in a manner which would cause the lender to seriously evaluate the request. Nor was the oral application to Creative Financing sufficient to satisfy the contractual requirements, as the evidence did not establish that this broker was a "commercial lending institution" as contemplated by the agreement.

*See Asplund v. Marjohn Corp.,* 66 N.J.Super. 255, 168 A.2d 844, 849, *cert. denied,* 35 N.J. 61, 171 A.2d 147 (1961).

9. The terms of the sale to the ultimate purchaser in this case were equivalent to those offered and accepted by Cooper Association (other than price).

10. I note that paragraph 6 of the proposed extension agreement provides: "If Buyer shall fail to make settlement on or before January 4, 1985, the entire deposit of $30,000.00 will be forfeited to Seller, and the Agreement of Sale date August 1, 1984 will be null and void." The meaning of paragraph 6 is not altogether clear to me. It is possible that this remedy was intended to be exclusive and supersede the remedy provision of the original agreement, *see* Finding of Fact No. 10. Liquidated damages may have been the quid pro quo for the waiver of the mortgage contingency clause. If so, Van Sciver is undercutting its own claim by requesting a finding that the parties entered into a binding contract to extend the settlement deadline. However, I need not reach this question since I find that there was no acceptance of the proposed extension agreement.

date had passed, Van Sciver did not choose to treat the agreement as breached, but was prepared to extend the deadline for settlement. There is no dispute that Cooper and Sameloff met with Van Sciver's attorney and discussed terms for extension of the settlement deadline. At the close of the meeting, it was understood that Van Sciver's attorney would reduce the terms discussed to writing and, at Cooper's insistence, would send it to defendants' attorney for his review. Their attorney subsequently advised them not to sign the agreement.

Based upon the description of the meeting in the testimony of Sameloff and Cooper, I believe that their request that the proposed agreement be reduced to writing and sent to their attorney reasonably manifested their expectation that they would have a further opportunity to review the proposal before committing themselves. An acceptance of an offer must be unequivocal and express a present intent rather than a future contemplated action. *See Mellon Bank N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3d Cir.1980); *Hedden v. Lupinsky,* 405 Pa. 609, 176 A.2d 406 (1962). While the question is not wholly free of doubt, I find that no agreement was reached on December 4, 1984.[11] *See Knight v. Gulf Refining Co.,* 311 Pa. 357, 166 A. 880 (1933) (burden of proving a modification or change in a prior contract rests with the party asserting it).

An appropriate order will be entered.

### ORDER

AND NOW, this 19 day of May, 1987, upon consideration of evidence admitted at trial and the parties' post-trial submissions, it is ORDERED that the Chief Deputy Clerk in Charge of Bankruptcy Operations shall enter judgment, in accordance with Bankr.Rule 9021(a), as follows:

1. in favor of plaintiff and against defendant William Cooper Associates, Inc. in the amount of $185,000.00, plus interest from September 17, 1985.

2. in favor of plaintiff and against defendant Martin Sameloff in the amount of $29,000.00, plus interest from September 17, 1985.

It is further ORDERED that plaintiff's total recovery from the two defendants shall not exceed $185,000.00, plus interest from September 17, 1985.

---

**11.** As a result of this finding, I need not decide if the Statute of Frauds is applicable in this case.