591 A.2d 1086

**David L. SCHERER and Debra A. Scherer, his wife**

v.

**William E. NASE and M. James Maxwell and Lapp & Alderfer, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued March 13, 1991.

Filed May 30, 1991.

38

Jeffrey G. Trauger, Perkasie, for appellants.

Thomas S. Algeo, Telford, for appellees.

Before MONTEMURO, JOHNSON and HESTER, JJ.

JOHNSON, Judge:

The owners of certain residential real estate, along with their real estate sales agent, appeal from a judgment on a nonjury verdict entered in favor of the prospective buyers. The judgment awarded the buyers the net amount of the hand money held in escrow after deducting certain amounts representing interest costs found to be due the owners.

We are asked to interpret the terms "completed mortgage application" and "responsible mortgage lending institution" as they appear in a mortgage contingency clause within a standardized form agreement for the sale of real estate. In construing these terms, we are asked to determine whether a good faith effort to obtain financing may be found where the loan application consists only of oral communications between the buyers and a mortgage broker.

■ We conclude that a good faith effort requires more than an oral inquiry regarding a loan application; it requires a request for financing made in a manner that would cause a lender to seriously evaluate the request and formally respond thereto. Since we find that a good faith effort to obtain financing is lacking on the facts presented on this appeal, we need not reach the question of whether a mortgage broker is, or is not, a responsible lending institution under the agreement. We reverse the judgment in favor of the buyers and remand for a new trial.

David L. and Debra A. Scherer (the Scherers) entered into a written agreement with William Nase and James Maxwell (the Sellers) for the purchase of improved real estate in East Rockhill Township, Bucks County (the Perkasie property) for the sum of $235,000. The Scherers deposited $500 with Lapp & Alderfer, Inc. (the Sellers' Agent, or Agent) after signing the agreement of sale. Subsequently, the

Scherers deposited an additional $23,000 with Sellers' Agent. Both sums were deposited in Agent's escrow account pending settlement on the property.

The Agreement of Sale contained a mortgage contingency clause which required that the Scherers secure a mortgage commitment by January 31, 1989. It provided:

   4. **MORTGAGE CONTINGENCY (1–86)** This sale is NOT contingent upon any mortgage financing except as hereinafter provided.

   (a) Mortgage terms required by Buyer. Amount of mortgage loan $100,000.00, Term 30 years. Interest rate 10% **HOWEVER, BUYER AGREES TO ACCEPT THE INTEREST RATE AS MAY BE COMMITTED BY THE MORTGAGE LENDER,** not to exceed a maximum interest rate of 11%

   (b) Within ten (10) days of Seller's approval of this agreement, *Buyer shall make a completed mortgage application to a responsible mortgage lending institution through the office of RE/MAX heritage realty who for the purposes of negotiating for the said mortgage loan, shall be considered the Agent for the Buyer.*

   (c)(1) Buyer will, upon receipt of a mortgage commitment, promptly provide a copy to Seller, Agent and/or Sub-agent, if any.

   (2) Mortgage commitment date January 31, 1989. If a written commitment is not received by the above date, Buyer agrees to extend the commitment date until Seller terminates this agreement, in writing.

   (3) Should the mortgage commitment: not be valid until the date of settlement, be conditioned upon the sale or settlement of any other property or contain any other condition not specified herein, Seller has the option to terminate this agreement, in writing. In the event Seller terminates this agreement as specified in paragraphs (c)(2) or (3), or the mortgage commitment is not obtained by the date of settlement, all deposit monies paid on account shall be returned to the Buyer,

subject to the payments required, if any, provided for in paragraph # 7(c), 1, 2, and 3.

(d) Seller hereby agrees to permit inspections by authorized appraisers, reputable certifiers and/or Buyer as may be required by the lending institution or insuring agencies.

Amended Complaint, Exhibit A, Agreement of Sale, October 30, 1988, Paragraph 4 (capitals and bolding in original) (additional emphasis [underlining] supplied). The agreement also provided for settlement on February 28, 1989.

Paragraph 14 of the Agreement sets forth the provisions for default by the buyer, in relevant part as follows:

**14. DEFAULT–TIME OF THE ESSENCE (1–79)** ... Should the Buyer:

(a) ....

(b) .... fail to cooperate in the processing of the mortgage loan application, which acts would result in the failure to obtain the approval of a mortgage loan commitment, or

(c) Violate or fail to fulfill and perform any other terms or conditions of this agreement,

then in such case, all deposit money and other sums paid by the Buyer on account of the purchase price, whether required by this agreement or not, may be retained by the Seller:

(1) On account of the purchase, or

(2) As monies to be applied to the Seller's damages, or

(3) As liquidated damages for such breach,

as the Seller may elect....

As plaintiffs at trial and again as appellees on this appeal, the Scherers contend that the mortgage commitment was not obtained by the date of settlement, February 28, 1989, and therefor, pursuant to Paragraph 4(c)(3) of the Agreement, all deposit monies should be returned to them. The Sellers and the Agent argue that all of the efforts of the Scherers, when taken together, fall short of a good faith attempt at securing mortgage financing and that the Scher-

ers' default dictates that the Sellers, along with their Agent, may retain the deposit monies as liquidated damages, pursuant to Paragraph 14(b) and (c) of the Agreement.

Both sides to this dispute and the trial court refer us to two appellate court cases as being most nearly on point in deciding this case. The cases were considered by the trial court in arriving at its decision. They are *Ormond Realty v. Ninnis*, 341 Pa.Super. 101, 491 A.2d 169 (1985), and *Rosen v. Empire Valve and Fitting, Inc.*, 381 Pa.Super. 348, 553 A.2d 1004 (1989). Upon our own independent review, we are unable to find either case dispositive in deciding this appeal.

In the *Ormond Realty* case, our distinguished colleague, the Honorable Phyllis Beck, was called upon to examine a mortgage contingency clause very much like that presented in this case. However, in that case, the parties had stipulated to the very issue which forms the basis of the dispute before this court. Judge Beck twice refers to the good faith effort of the buyers in the *Ormond Realty* case:

Appellants made a good faith effort to obtain a mortgage which would conform with the specifications in the agreement, but were unable to do so by the commitment date, October 20, 1979.

. . . .

It is stipulated that appellants made a timely application to obtain a mortgage commitment by the commitment date. Since appellants made a bona fide effort to secure a mortgage commitment by October 20, 1979, but failed to obtain one, the agreement automatically became null and void by operation of paragraph 4(d). . . .

341 Pa.Super at 104, and 106, 491 A.2d at 171, and 172. It is very clear that Judge Beck was able, in fact required by virtue of the stipulation, to assume good faith in analyzing and construing the agreement in that case.

The Honorable George T. Kelton, in his reasons set forth at the conclusion of testimony and argument in this case in the trial court on December 5, 1989, stated:

So the key question in the case as stated by Judge Beck in the Ormond Realty case is whether or not the plaintiffs made a good faith effort to obtain a mortgage which would conform to the specifications in their agreement, and whether they were unable to do so by the end of the commitment date.

Waiver Trial Transcript, December 5, 1989, Kelton, J., page 182, Brief of Appellants, page A–12. However, we understand *Ormond Realty* to require a finding of good faith *before* any attention can be turned towards determining whether a failure to obtain a mortgage commitment has resulted in the lapse of the agreement through passage of time. As we will discuss later, our inability to find a good faith attempt by the Scherers prohibits us from reaching the type of analysis which Judge Beck so ably performed in *Ormond Realty.*

We find *Rosen v. Empire Valve and Fitting, Inc., supra,* equally unhelpful in resolving this appeal. In that case, we recognized that if mortgage financing could not be obtained, the agreement in that case would also be null and void, unless the buyers had been guilty of bad faith. 381 Pa.Super. at 352, 553 A.2d at 1006. As in *Ormond Realty,* the *Rosen* court was not called upon to evaluate the good faith of the buyers. We found that the complaint had sufficiently stated a cause of action, and could withstand preliminary objections, where the mortgage commitment had been issued before the commitment date, but was later withdrawn after the commitment date but before settlement, based upon a substantial change in circumstances of the mortgagor's guarantor. After citing to the *Ormond Realty* case, this court appropriately stated:

> [T]he fact that a mortgage commitment, once obtained, was later cancelled or withdrawn, does not mean that the buyer must forfeit his deposit, *provided that he has acted diligently and in good faith.*

381 Pa.Super. at 353, 553 A.2d at 1006 (emphasis added).

▮ Thus, it can be said that, although neither *Ormond Realty* nor *Rosen* involve a factual analysis that would

assist us in determining what constitutes "good faith", both cases stand for the proposition that a *finding* of good faith is a necessary element of any claim seeking to recover hand money based upon a mortgage contingency clause and a real estate sales agreement becoming null and void through passage of time and the passing of an express commitment date.

The requirement of a good faith effort was spelled out by our former colleague, the Honorable Gwilym A. Price, Jr., in the case of *Newman v. Sablosky*, 268 Pa.Super. 85, 407 A.2d 448 (1979), as follows:

> Agreements of sale subject to a condition precedent of obtaining adequate financing are valid and binding. Such an agreement, however, imposes a requirement of diligent and good faith effort on the part of the purchaser to secure the proper financing. *Cf. DiBinedetto v. DiRocco*, 372 Pa. 302, 93 A.2d 474 (1953); *Tieri v. Orbell*, 192 Pa.Super. 612, 162 A.2d 248 (1960); *King v. Clark*, 183 Pa.Super. 190, 130 A.2d 245 (1957). Appellant's ability to cancel the transaction could be exercised only if, after a good faith effort, he was unable to obtain the financing.

*Id.* 268 Pa.Super. at 89, 407 A.2d at 451.

We turn, then, to the facts established at the trial in this case. In reviewing the facts, we are mindful that the burden to establish good faith remains on the Scherers, as moving parties, in the trial court. In considering the evidence, we of course will not disturb the findings of the trial court sitting without a jury unless they are unsupported by competent evidence in the record or predicated on error of law. *Kepple v. Fairman Drilling Co.*, 380 Pa.Super. 52, 551 A.2d 226 (1988).

Seven witnesses testified. Credibility was not a factor; the testimony of the parties was not diametrically opposed as to any material issues.

The Scherers were both school teachers with a combined income of $80,985 as shown on a financial information form prepared in connection with their contemplated purchase of

the Perkasie property. They were living in a house owned by them which, at the time they entered into the agreement here under review, was listed for sale at $349,000. The house they proposed to buy, the Perkasie property, was priced at $235,000 under the agreement. The mortgage contingency clause on the Scherers' proposed purchase called for a $100,000 conventional mortgage, payable over thirty years at a maximum interest rate of 11%.

Although the written agreement signed by the Scherers had space for the insertion of contingencies relating to "the sale or settlement of any other real estate", there was no mention of the Scherers present home, or their need or desire to sell that home, inserted in the agreement. Robert C. Alderfer, the Sellers' Agent, testified without contradiction that when the Scherers' agent, Rita Detweiler, the owner of Remax Heritage Realty, brought in the agreement of sale, he questioned the fact that the agreement lacked a "72–hour clause", which would have made the agreement subject to the sale of the Scherers' present home. Detweiler told her counterpart that the 72–hour clause was not necessary, since the Scherers had a friend in the mortgage business who had assured them that he would be able to get them the mortgage or a swing loan, and the Sellers shouldn't be concerned about it. When called to testify, Detweiler remembered having discussed the 72–hour clause but could not remember exactly what was said.

John Wilson, a mortgage broker, had been called by Debra Scherer in early November 1988 by long distance telephone. The record is clear, and Judge Kelton found as a fact, that Wilson advised Mrs. Scherer that there would be no problem securing an $100,000 mortgage. Wilson's testimony, while under cross-examination, included the following:

Q. [Wallace H. Bateman, Sellers' Counsel]: In this case, you spoke to Mrs. Scherer over the phone, is that right?

A. Yes.

Q. How many times?

A. Twice.

Q.  The first time she called you she told you they were applying for a mortgage;  am I right?

A.  Yes.  They were looking to see whether they would be considered for a mortgage.

Q.  The decision to loan the money is not yours;  am I correct?

A.  That is vague in a sense, that and the reason I am saying that is, that the industry standard is that they would have qualified for the mortgage given their income, their credit and the property they were purchasing.

Q.  You told them that?

A.  Yes.

THE COURT: That is the first conversation?

THE WITNESS: Yes.

THE COURT: What was the second conversation?

THE WITNESS: I think the second conversation, and it has been a year, but I think the second conversation was somewhat a reiteration of the first.

--------

BY MR. BATEMAN:

Q.  So during both conversations Mrs. Scherer said that she wanted to borrow $100,000 and you told her she would qualify based on her income and assets and liabilities;  am I correct?

A.  Correct.

Q.  You took down some information over the phone from her;  am I correct?

A.  Yes.

Q.  Did you write it down?

A.  Yes.

Q.  Did you make notes of it?

A.  Yes.

Q.  Do you keep a file?

A.  No.

Q.  Where are the notes?

A. I have no idea. The only reason I say that is I talk with a lot of people over the phone and loans happen or don't happen.

Q. Is it your practice to maintain files on your clients?

A. Yes.

Q. But you didn't maintain one in this case?

A. If there is a written mortgage application, we would maintain a file. We have to.

Q. You didn't have a written mortgage application in this case, is that right?

A. No, we talked about it, the income, we talked specifically about mortgage payments, that type of thing.

Q. You never contacted any banks or other institutions about the Scherers, did you?

A. No.

Q. You just spoke to her yourself and gave her your opinion is that right?

A. Correct.

THE COURT: What did you say to her?

THE WITNESS: We took, she gave me what their gross total income would be and I calculated what the mortgage payment would be. And I said, yes, you would qualify for a mortgage in that amount.

Waiver Trial Transcript, December 5, 1989, pages 55–57.

The Scherers brought this action on the ground that their lack of success in securing financing, where such is a condition precedent to the buyers' contractual performance, makes performance unenforceable. That lack of success, however, must clearly relate to the facts established in the record. In interpreting the intent of the parties in a written contract, when the words are clear and unambiguous, the intent is to be determined only from the express language of the agreement. *Ormond Realty v. Ninnis, supra* 341 Pa.Super. at 105, 491 A.2d at 172.

While there was much testimony offered concerning the Scherers difficulties in attempting to sell their existing residence, we fail to see how those difficulties are in any

way material to an analysis of the Scherers' efforts with respect to the agreement here under review. The agreement expressly required the Scherers to "make a completed mortgage application to a responsible lending institution through the office of Remax [H]eritage [R]ealty."

During the testimony of Robert Alderfer, the Sellers' Agent, the following response was elicited with regard to the relationship between the various parties:

Q. Did you ever make any inquiries as to whether or not Mr. and Mrs. Scherer had made a mortgage application and whether they had qualified?

A. Yes, when the sale agreement was delivered to us, I inquired of Rita [Detweiler, the Scherers' agent] what the mortgage possibilities were because, as she indicated, she had submitted a buyer's report on their financial income and I asked about the mortgage possibilities because it looked as though it was a little skimpy. And she said they have a friend in the mortgage business who is going to help them and they had told Rita that there would be no problem, that they would take care of the mortgage business themselves.

And then approximately 12 or 15 days later, I called Rita to see if an application had been made, because the ten days of the agreement of sale had expired, from where, from when she should have obtained a copy of the application and she said no, she is not handling that. They are handling that directly with their friend in the mortgage business.

But she said they are very good people, they have a good income and they have a lot of equity in their home and they have a very expensive home and the mortgage is only something like $140, $150,000, so she said they assured her they can take care of the mortgage themselves.

Waiver Trial Transcript, at pages 155–156.

Debra Scherer initiated no more than two telephone calls to a mortgage broker, inquiring about the availability of a mortgage, sometime shortly after the Scherers signed an

agreement to purchase the Perkasie property. Debra Scherer was informed by the mortgage broker, John Wilson, that the Scherers would qualify for a $100,000 mortgage. Neither she nor her husband ever provided Wilson with a copy of the sales agreement on the property. The Scherers never requested any formal decision on their inquiry. The mortgage broker never opened a file on the matter, since no written application for a mortgage was ever made by the Scherers.

Sometime around the end of December, 1988, Rita Detweiler, the Scherers' agent, took another mortgage broker, Charles Chippak of Firstar Mortgage Company, to speak with the Scherers. Chippak received information from them, but on later inquiry with Detweiler, he was informed that the Scherers did not believe they could go ahead with the transaction even if they were approved for the mortgage. Neither Wilson nor Chippak were called upon to formally process an application on the Perkasie property.

There is nothing in the record to support a conclusion that the Scherers were ever turned down, or that any application of theirs was ever rejected with respect to mortgage financing. Settlement on the Perkasie property was to be made on or before February 28, 1989 under the clear terms of the agreement. By that date, neither the Sellers nor their Agent had been informed that the Scherers were unable to secure a mortgage. The first knowledge that the Sellers had that the sale would not go through was when David Scherer called William Nase, one of the sellers, early in March 1989. In that conversation, Scherer stated to Nase that the agreement had expired. Scherer further stated that the agreement provided that if the Scherers did not sell their present house, they were entitled to the return of their deposit money with interest. Scherer wanted the deposit money returned.

The agreement is very clear that the sale of the Perkasie property was "NOT contingent upon any mortgage financing except as ... provided" in the agreement. Moreover, the agreement was equally clear that the Perkasie sale was

"NOT contingent in any manner upon the sale or settlement of any other real estate". We need not concern ourselves about construing the language against either party, because the language is totally unambiguous. In addition, the ' Scherers were represented throughout this transaction by a licensed real estate broker who was quite familiar with the type of clauses which would protect the Scherers in the event the sale of their present house became difficult. This protective language was consciously not inserted into the agreement by the agent for the Scherers, Detweiler, on her perception that her clients' "friend in the mortgage business" would be able to handle the mortgage application and the Scherers would have no difficulty selling their house.

Where an agreement expressly provides that it shall not be contingent upon any mortgage financing not spelled out in the agreement, where it further provides that the sale will not be contingent upon the sale of other real estate, and where the only source contacted for mortgage funds has verbally advised the parties that an application based upon terms spelled out in the agreement will, if submitted, be approved, we must conclude that the failure to even prepare and submit a written application for mortgage financing falls far short of a good faith effort to obtain a mortgage.

No explanation of any sort was offered by the Scherers, at trial, for their not having submitted a written application. While Debra Scherer testified that their mortgage broker, Wilson, had told her that the Scherers would have to sell their present home in order to qualify for a new one, this information in no way would serve as legal justification for not submitting a written application. Wilson did not, and could not, testify that he would refuse to receive an application for mortgage funds until after the Scherers had sold their present home. In point of fact, the position which any responsible lending institution might take with respect to eligibility of an applicant must necessarily depend upon the totality of the information contained in an application.

Although John Wilson was called by the Scherers to support their claim of a good faith application, he was

reduced to testifying in broad generalities exactly because the Scherers' failure to submit a written application in November 1988 resulted in Wilson not having generated a file in the matter from which he could testify more than a year later. The trial court found as a fact that Wilson did $60,000,000 worth of mortgage business in the two years just prior to his testifying. That finding is supported by the record. It leaves unanswered, however, the weight to be given to his answers regarding an application for $100,000 of mortgage funds, representing one third of one percent of Wilson's annual business, where that application was never reduced to a writing and, consequently, no file was ever kept.

The case of *In re J.B. Van Sciver Company v. William Cooper Associates,* 73 B.R. 838 (E.D.Pa.1987) is particularly instructive regarding the resolution of this appeal. In *Van Sciver,* the buyers entered into an agreement with the sellers for the sale of real estate. The agreement contained the following mortgage contingency clause:

> This agreement is contingent upon Buyer *obtaining a loan commitment* in an amount of not less than $1,500,000.00 *from a commercial lending institution* on or before October 31, 1984 at a rate of not greater than prime. Loan application is to be made within 10 days of the execution of this Agreement by the Seller. In the event Buyer is unable to obtain this loan commitment and all required approval incidental thereto by October 31, 1984 this Agreement shall be null, void and of no further force or effect and all sums and notes paid or delivered hereunder shall be returned to the Buyer.

*Van Sciver,* 73 B.R. at 841 (emphasis added).

In the ten day period following the signing of the agreement the buyer made oral inquiries regarding financing at two banks. The buyer also orally contacted a brokerage company named Creative Financing, Inc. However, the buyer made no written loan applications to any commercial lending institutions or brokers within the ten day period. The buyer later informed the seller that the buyer had been

unable to obtain financing and requested the return of all funds on deposit.

The United States Bankruptcy Court for the Eastern District of Pennsylvania determined that the buyers did not make a good faith effort to obtain financing because they had not complied with the provisions of the mortgage contingency clause by "obtaining a loan commitment from a commercial lending institution." As a basis for its conclusion the court found that the buyers did not meet their burden of proof. As an alternative basis the court stated that:

> the evidence was insufficient to establish that a loan application was made to a commercial lending institution within ten days of the signing of the agreement. I am not convinced that the requests for financing to the two banks were made in a manner which would cause the lender to seriously evaluate the request. Nor was the oral application to Creative Financing sufficient to satisfy the contractual requirements, as the evidence did not establish that this broker was a "commercial lending institution" as contemplated by the agreement.

*Van Sciver*, 73 B.R. at 847 n. 8 (citations omitted). This rational would be applicable here, were we to consider John Wilson's status as a "responsible mortgage lending institution".

As we have already established, agreements of sale subject to a condition precedent to obtain adequate financing are valid and binding. *Newman v. Sablonsky*, 268 Pa.Super. 85, 407 A.2d 448 (1979). Such an agreement, however, imposes a requirement of diligent and good faith effort on the part of the purchaser to secure the proper financing. *Id. Van Sciver* suggests that a good faith effort is comprised of two components. First a lending institution must be contacted. Second a mortgage application must be completed. *See Van Sciver, supra.*

With respect to the term "loan application" the *Van Sciver* court found that:

it is appropriate to construe the term "loan application" to include a requirement that the application have some formal characteristics. This is not to say that the application need necessarily be in writing, but there should be a showing that the request for financing was made in a manner which would ordinarily cause a lender to seriously evaluate the request. A casual brief discussion with a bank employee would not suffice.

*Van Sciver* 73 B.R. at 845 (footnote omitted). As did the Bankruptcy Court, we note that the verb "apply" is defined, inter alia, as follows: "To make a formal request or petition, usually in writing, to a court, officer, board or company ..." Black's Law Dictionary 91 (5th ed. 1979).

While the trial court considered and determined that the agreement under review did not impose upon the Scherers any obligation to secure a swing loan, we do not reach that question, since we find that the Scherers have failed to mount a good faith effort on their basic obligation. Our basic disagreement with the trial court is its finding that a formal application to the mortgage broker would be a "vain act" because the Scherers had been advised "by their mortgage broker and by the sellers' agent's mortgage broker that a mortgage could not be secured until they had entered into an agreement to sell their existing house." Memorandum Opinion and Order, August 8, 1990, page 4. Our review of the record does not disclose sufficient testimony to support this finding of the trial court.

After both counsel had finished examining John Wilson, the Scherer's mortgage broker friend, the following colloquy took place between the witness and the trial court:

THE COURT: Were there any discussions with the Scherers, either one of them, with reference to the house that they then owned?

THE WITNESS: Yes.

THE COURT: What were those discussions.

THE WITNESS: That we discussed whether they would qualify, I gave them basically what their ratios are and I said, you will qualify but you will have to sell your other

property because you will not be able to qualify with all those debts, and by all those debts, I mean new first mortgage of $100,000, swing loan of X, and current mortgage payment.

Waiver Trial Transcript, pages 62–63. While Wilson did testify that the Scherers would have to sell their other property, at no place in the record did he state that he was unprepared to receive, and approve, a mortgage application which could allow for such contingency in writing. Neither Wilson, nor Alderfer nor Detweiler testified that a mortgage application could not be submitted and approved until an agreement was entered into for the sale of the Scherers' existing house. It is possible the trial court was concentrating on what performance is required *at time of settlement* as distinct from what steps must be taken, in good faith within ten days, in order to proceed *towards* settlement. Here, the Scherers refused to move ahead with applying for a mortgage on the Perkasie property in the face of the readiness of both Wilson and Chippak to process the Scherers' written application, if received.

We concede, as did the *Van Sciver* bankruptcy court, that there may be factual situations in which the mortgage application need not be in writing. This case is not one of them. We here have testimony from only one of two prospective buyers as to what the terms were upon which the oral application for mortgage funding was made. At time of trial, Debra Scherer could not remember whether she had told her broker where the property was located. Although she was definite in her testimony that she had given Wilson her income at that time, she could not remember at trial what she had told him that income had been. Nor could she even remember, at trial, what her income had been one year earlier. Under cross-examination, with her recollection refreshed, Mrs. Scherer testified to having stated at her deposition on September 19, 1989 that the joint income of her and her husband at the time of the alleged mortgage application was $72,000. At the time of her deposition, she testified that the Scherers' joint income in

September 1989 was $91,000. She identified a buyers' financial information form bearing her signature, showing a combined annual income, at or about the time of the mortgage application, of $80,985.

Wilson, the mortgage broker, was unable to testify to specifics since no written application had ever been tendered to him thereby generating a file. Where surprisingly little detail is proffered to support an alleged bona fide mortgage application, and where the mortgage brokers both appear to have remained ready and willing to receive a formal application, we can only conclude that the failure to pursue an open invitation to formally apply constitutes an absence of good faith.

When we consider that the relationship between the buyers and the mortgage broker is a close one, going back at least ten years, this provides additional support for the need, in this case and on these facts, to require more formalism than has been proffered before concluding that the claimants' burden of proving good faith has been met.

Given the proposed sale price of $235,000, the deposit sums totalling $23,500, and the involvement of professional realtors representing both the buyers and the sellers, and given the clear language of the sales agreement, it seems more likely than not that good faith efforts to obtain financing would have generated some concrete evidence of those efforts. As in *Van Sciver*, we find the lack of explanation for the paucity of evidence unconvincing. 73 B.R. at 846.

We conclude that the Scherers, as plaintiffs, failed to meet their burden of proof with regard to a good faith application for mortgage financing. Since that finding of good faith is a necessary element of their right to recover, we are constrained to reverse the judgment awarding recovery of the deposit money. In reviewing the pleadings, we note that the Sellers and their Agent only asked for a new trial in their post trial motions. We therefore are limited to remanding this matter to the trial court for further proceed-

56

ings not inconsistent with the views expressed in this Opinion.

Order entering judgment in favor of plaintiffs and against defendants is REVERSED. Case REMANDED. Jurisdiction relinquished.